1998-NMSC-034

966 P.2d 752

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Wesley McDONALD, Defendant–Appellant.**

**No. 23,946.**

Supreme Court of New Mexico.

Sept. 23, 1998.

Phyllis H. Subin, Chief Public Defender, Susan Roth, Assistant Appellate Defender, Santa Fe, for Appellant.

Tom Udall, Attorney General, Max Shepherd, Assistant Attorney General, Santa Fe, for Appellee.

## OPINION

FRANCHINI, Chief Justice.

{1} Wesley McDonald was convicted of, among other crimes, first degree murder under NMSA 1978, § 30–2–1(A) (1994) and sentenced to life in prison. The issues in this appeal concern four events at trial. We affirm.

## I. FACTS AND ISSUES

{2} McDonald and his girlfriend, Julie Stanfill, met the victim, Ernesto Garcia, at the latter's home on Friday evening, September 29, 1995. They had come to collect forty dollars owed to Stanfill for cleaning Garcia's house. When they arrived, Garcia was in his car, and they got in with him. They drove around Alamogordo for a time and stopped near a golf course. McDonald and Garcia started arguing. According to Stanfill's eyewitness testimony, McDonald, who was in the back seat, hit Garcia over the head with a bottle, then pulled him into the back and strangled him with his hands. McDonald and Stanfill then drove to El Paso, Texas, where they buried the body.

{3} The first trial event involves the testimony of a man who was a cell mate of McDonald while the latter was awaiting trial (Cell Mate One). For four or five days, a second cell mate (Cell Mate Two) was incarcerated with McDonald and Cell Mate One. McDonald and Cell Mate One were both Anglo; Cell Mate Two was Hispanic. According to a pre-trial statement by Cell Mate One, McDonald was silent about his crime until the departure of Cell Mate Two from the cell, whereupon McDonald confessed to the crime in detail, at one point referring to Garcia with foul, anti-Hispanic comments. A motion in limine to delete the anti-Hispanic segments of the statement was denied because the trial judge saw anti-Hispanic ani-

mus as a factor in the motive for the killing. The denial of the motion is not in issue here.

{4} Cell Mate One testified at trial, and, when he was initially asked why he thought McDonald had remained quiet about his acts until Cell Mate Two was removed, Cell Mate One was hesitant to offer an opinion. There was a bench conference, where it became plain that the reason for McDonald's initial failure to speak was relevant, since defense counsel had asserted that Cell Mate One had fabricated the whole story. The judge ruled that what was bound to ensue—a statement including further anti-Hispanic references on the part of McDonald—would be more probative than prejudicial. The prosecutor reasoned that the evidence would explain McDonald's initial failure to speak. The prosecutor was cautioned to go no further than required and, in fact, the prosecutor elicited the statement that McDonald had confided only in Cell Mate One because they "were the same race."

{5} The second event at trial concerned lengthy testimony by the State's forensic expert on blood splatter patterns. The expert testified extensively on two types of blood stains found on a T-shirt and boots belonging to McDonald. Medium velocity stains on the two items were said to be consistent with blood splatter stains caused when an individual is hit hard enough to cause blood to fly from the wound. In this case, transfer stains occurred when the items came into contact with blood fresh enough to be absorbed. The State's DNA expert testified that the blood found on the items matched the blood of the victim.

{6} Defense counsel then questioned the forensic analyst to show that the blood patterns were not indicative that McDonald was the killer—that the patterns would be the same if he were merely in the car at the time of the murder, for example. Defense counsel was also apparently trying to show, through questions on coagulation, that the transfer stains could have resulted from contact with the body hours later, under the theory that McDonald was not the murderer, but merely helped the true murderer, his girlfriend, dispose of the body.

{7} On redirect examination, the prosecutor asked the witness how much blood would be on the car seats five-and-one-half hours after the murder and whether it would be dried or absorbed by the seats by then. The expert stated that this would depend on the initial thickness of the blood on the seats. He was then asked how long it would take for the blood to solidify, and he responded that it would depend on the volume of blood present, and he also noted that blood coagulates at different rates for different people.

{8} At this point, the judge read a question from a juror relating to the effect, if any, that being a diabetic would have on clotting time (the victim having been supposed to be a diabetic). The expert responded that he was not qualified to answer the question. The court then asked, "when we are talking about variations in clotting time, are we talking about variations of seconds, minutes, hours, or days?" The expert answered that it was a matter of seconds or minutes, whereupon defense counsel asked how he could answer that question if the victim may have been a diabetic.

{9} The judge then asked the question objected to herein: "Do you know enough to tell me if it took three hours for my blood to clot whether I would be here today or not?" The expert answered, "Depending on the size of the wound, you may not be here." McDonald now claims that the judge's statement indicated that the defense theory—that the blood was capable of being transferred for a long while after the initial wound—was weak, and that this was a reinterpretation of the evidence. From all appearances, the judge's question was asked in earnest, although it provoked a snicker from the prosecutor.

{10} There is, thirdly, an objection to the admissibility of testimony given by the State expert on the identification, analysis, and typing of DNA. Specifically, his qualifications are compared to those of DNA experts called in the case of *State v. Anderson*, 118 N.M. 284, 292–95, 881 P.2d 29, 37–40 (1994), where the experts held doctoral degrees in various relevant sciences. The expert in the instant case held a bachelor of science degree in biology and was the DNA analyst for the

New Mexico Department of Public Safety. His training consisted of a specialized course in molecular biology at the University of New Mexico and a course in DNA analysis with the FBI.

{11} The last issue raised by McDonald concerns the admission into evidence of the fact that he, at one point, had smoked marijuana. A hitchhiker, who was picked up by McDonald on his trip back from El Paso, testified that, on the way, they drank beer and threw the bottles out the window of the car. Once back in Alamogordo, according to the testimony, the hitchhiker "did sit down and smoke a joint with him and he relaxed."

## II. DISCUSSION

### A. Sensitive Testimony

{12} The improper and unnecessary interjection of racial or ethnic issues into a criminal trial is one of the most seriously prejudicial events that can transpire in a court of law. There is no place for irrelevant racial or ethnic material in the courtroom, and the non-probative introduction of such evidence is treated by the leading authorities almost always as harmful error.

{13} There are, nonetheless, instances when references to race or ethnicity may be legitimate during trial. This is true when the motive for a crime is racial hatred. In such a case, evidence of such hatred is relevant and admissible in spite of its potential prejudicial effect. *United States v. Beasley,* 72 F.3d 1518, 1528 (11th Cir.1996). Furthermore, " '[r]acist proceedings,' in the context of a jury trial, are those where the issue of race so permeates the trial in a *discriminatory manner* that justice could not possibly be done." *State v. Bowles,* 530 N.W.2d 521, 536 n. 21 (Minn.1995) (emphasis added). Finally, it is well-established that where the racially tinged evidence is relevant to an issue in the case and not prejudicial to the defendant, there is no error. *United States v. Hoyte,* 51 F.3d 1239, 1244 (4th Cir .1995); *Mallory v. State,* 261 Ga. 625, 409 S.E.2d 839, 842 (Ga.1991).

{14} We review the admission of the questioned testimony under an abuse of discretion standard to see whether the pro-

bative value of the evidence was outweighed by any prejudicial effect. *State v. Meadors,* 121 N.M. 38, 48, 908 P.2d 731, 741 (1995). In the instant case, after listening to the statement of Cell Mate One, the trial judge apparently concluded that McDonald's anti-Hispanic comments about the victim and others could be put before the jury on the issue of motive. We cannot say on such facts that it was an abuse of discretion for her to do so. It was also proper to introduce McDonald's comments after Cell Mate Two departed, because the evidence was probative of the State's claim that McDonald actually had confessed to the crime in detail. McDonald had asserted that the witness made up the story.

{15} It has not been suggested that evidence touching on ethnic, racial, linguistic, or cultural background is *per se* prejudicial. McDonald has pointed out that the issue of anti-Hispanic animus entered into this trial in the specific contexts discussed above. McDonald has not shown that there was any tendency for the matter to become at all inflamed beyond its legal validity in the minds of the jury; the issue of anti-Hispanic animus was in no way utilized argumentatively for its own sake by the prosecutor. Since we detect no aspect of the testimony that was prejudicial and not probative, we find no abuse of discretion in the admission of the testimony.

### B. Judge's Comment on the Clotting of Blood

{16} A trial judge " 'must be careful not to say or do anything which would add to a party's burden of proof, or detract from the presumption to which a person charged with crime is entitled.' " *State v. Caputo,* 94 N.M. 190, 191–92, 608 P.2d 166, 167–68 (Ct.App.1980) (quoting *State v. Sedillo,* 76 N.M. 273, 275, 414 P.2d 500, 501 (1966)). "A trial judge should studiously avoid making any remark or statement in the presence of the jury concerning factual issues or which may be construed as conveying his opinion concerning the merits of the case." *State v. Sanchez,* 112 N.M. 59, 66, 811 P.2d 92, 99 (Ct.App.1991). As one court has noted, "In determining whether a judge has

exceeded the bounds of acceptable conduct, the proceedings must be viewed as a whole. The critical inquiry is 'whether the trial judge's behavior was so prejudicial that it denied [the appellants] a fair, as opposed to a perfect[,] trial'" *United States v. Johnston,* 127 F.3d 380, 388 (5th Cir.1997) (first alteration in original) (quoting *United States v. Williams,* 809 F.2d 1072, 1086 (5th Cir.1987) (quoting *United States v. Pisani,* 773 F.2d 397, 402 (2d Cir.1985)

{17} The clotting time of blood was material to the case but not in any way that seemed to connect with the question asked by the judge. Its only effect was the laugh emitted by the district attorney, apparently trying to take tactical advantage of the momentary confusion. Other than that, the proceedings continued to their conclusion uneventfully in this regard. The question was not asked in a way so as to asperse McDonald, the State, or the witness. There was nothing to impinge upon the fairness of the entirety of the trial nor was there anything that could be said to have been likely to influence the verdict improperly. Therefore, on this issue, we find no reversible error. *See United States v. Smith,* 928 F.2d 740, 743 (6th Cir.1991) (holding that a judge's comments at a sidebar conference did not affect a jury verdict in a criminal trial.)

## C. The Expert's Qualifications

{18} McDonald argues that the qualifications of the State's DNA expert were lacking as a matter of law. This argument rests largely on the highly complex nature of DNA analysis on the one hand, and the alleged relative inexperience or deficient training of the expert on the other.

{19} The trial judge has wide discretion to determine whether a witness is qualified to give testimony as an expert, *Shamalon Bird Farm, Ltd. v. United States Fidelity & Guar. Co.,* 111 N.M. 713, 714, 809 P.2d 627, 628 (1991), and "no set criteria can be laid down to test [an expert's] qualifications." *Smith v. Smith,* 114 N.M. 276, 281, 837 P.2d 869, 874 (Ct.App.1992). Upon an abuse of discretion, however, the ruling of a trial judge on the qualifications of an expert may be reversed. *State v. Hernandez,* 115

N.M. 6, 24, 846 P.2d 312, 330 (1993); *cf. United States v. Gomez,* 67 F.3d 1515, 1525 (10th Cir.1995) (explaining that, in the Tenth Circuit, a trial court's admission of expert testimony is reviewed for plain error).

{20} Two important rules were laid down in *Hernandez.* The first concerns the proper construction of Rule 11–702 NMRA 1998, which provides in relevant part that "a witness qualified as an expert by knowledge, skill, experience, training or education may testify ... in the form of an opinion or otherwise." We emphasized in *Hernandez,* and we re-emphasize here, the disjunctive nature of the first "or" in the above rule. The variety of bases for qualifying an expert comports with the wide discretion given the trial judge in the matter and with the facts of this case, where the expert's knowledge, skill, and experience were indicated by his position as DNA analyst for the New Mexico Department of Public Safety. We cannot say that his special training with the University of New Mexico and the FBI was deficient to such a level that there was an abuse of discretion in allowing him to testify.

{21} Most significant, however, is the fact that the jury was free to weigh every aspect of the expert's qualifications and was free to disregard it entirely. *See* UJI 14–5050 NMRA 1998. As we said in *Hernandez,* "[a]ny perceived deficiency in ... education and training is relevant to the weight accorded by the jury to [the] testimony and not to the testimony's admissibility." 115 N.M. at 24, 846 P.2d at 330.

## D. The Marijuana

{22} Finally, we are presented with the issue of whether the jury's awareness of the fact that McDonald smoked a marijuana cigarette requires us to reverse the conviction. McDonald argues that this constitutes the admission of prior uncharged conduct in violation of Rule 11–404(B) NMRA 1998. He claims that the jury would unfairly believe that, if he could break the law as a drug user, he was a bad person and guilty of this murder. He relies on *State v. Rael,* 117 N.M. 539, 541–42, 873 P.2d 285, 287–88 (Ct.App. 1994). In *Rael,* the Court of Appeals held

that allegations of drug dealing by a defendant charged with possession of a firearm were not admissible. The State argued that keeping a gun was consistent with being a drug dealer, even though there was no independent evidence supporting the allegation that the defendant had dealt drugs. The Court of Appeals held that the evidence "transgresse[d] the limit of Rule [11–] 403 [NMRA 1998]." *Id.* at 542, 873 P.2d at 288.

{23} Rule 11–404(B) states in relevant part: "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Two cases elucidate the issue here. In *State v. Aguayo,* 114 N.M. 124, 128, 835 P.2d 840, 844 (Ct.App.1992), evidence of prior conduct was introduced to prove that the defendant employed the same conduct in the commission of a crime related to the prior conduct (child abuse). In *Rael,* the evidence of other conduct (drug dealing) was offered to prove that the defendant committed another crime (firearm possession). Nevertheless, in both cases, the prosecution attempted to prove that the defendants committed their crimes by acting in conformity with their purported reprehensible or illegal conduct, and to show conformity with prior criminal or other reprehensible conduct to raise an inference that the defendant committed the crime for which he was charged. Rule 11–404(B) plainly disallows such an evidentiary inference.

{24} Rule 11–403 NMRA 1998 states that otherwise relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. In its analysis under this rule, the *Rael* court concluded that " '[t]he danger of unfair prejudice from admission of drug-related evidence ... was great.' " (quoting *United States v. Ridlehuber,* 11 F.3d 516, 523 (5th Cir.1993)). Explaining that New Mexico courts have held evidence of a witness's involvement with drugs to be prejudicial, the *Rael* court held that a mere allegation of drug sales by a defendant charged with possession of a firearm transgresses the limit of Rule 11–403 even more clearly.

{25} In the case at hand, it has not been suggested there is any probative value in the hitchhiker's testimony that he smoked marijuana with McDonald. It is the State's burden to establish the probative value of its evidence, and given the possible evidentiary inferences similar to those in *Rael,* the trial court should have held the evidence to be inadmissible. Also, with respect to Rule 11–403, given the prejudicial effect inherent in drug-related evidence, the court should not have allowed such evidence to enter into this case. Nevertheless, the trial court could not have considered the admissibility of the evidence until *after* the witness testified thereto, and after this testimony, the trial court promptly addressed the matter. In fact, the trial court went so far as to offer a cautionary instruction to the jury, which McDonald refused. Because the trial court had no opportunity to address the admissibility of the evidence until after the witness testified thereto, and because the trial court offered an immediate remedy, we cannot say the trial court abused its discretion in allowing the State to offer drug-related testimony into evidence. *See Aguayo,* 114 N.M. at 128, 835 P.2d at 844 ("Admission of evidence is within the sound discretion of the trial court and the trial court's determination will not be disturbed in the absence of an abuse of that discretion.").

{26} Having concluded that Rule 11–403, Rule 11–404, and *Rael* are controlling authority, and that the trial court did not abuse its discretion in allowing the State to offer the drug-related testimony into evidence, we now turn to McDonald's specific contention, i.e., that the trial court abused its discretion in not declaring a mistrial. We note at the outset that we review for an abuse of discretion a trial judge's denial of a motion for a mistrial. *State v. Gibson,* 113 N.M. 547, 556 828 P.2d 980, 989 (Ct.App. 1992). It should be observed that, because the trial court did not abuse its discretion in allowing the State to offer the witness's testimony into evidence, the trial court did not, *a fortiori,* abuse its discretion in denying McDonald's motion for a new trial, a motion based on that very testimony. However, we examine the State's contention that *Gibson*

controls the outcome of this case, a contention with which we agree.

{27} *Gibson* was a prison-escape case involving a controversy over a statement made at trial by a correctional security superintendent at the prison from which the defendant allegedly helped some inmates to escape. The superintendent testified that the defendant visited one of the inmates before the escape, adding that the defendant visited the inmate while the defendant was " 'on parole.' " *Id.* The defendant moved for a mistrial, but the trial court denied the motion. On appeal, the Court of Appeals found that, because the trial court ruled that the jury did not hear the phrase "on parole," the trial court did not act contrarily to Rule 11–404(B), or other evidentiary rules, in allowing the State to offer the phrase into evidence. The Court of Appeals also reasoned that, even if the jury had heard the phrase, there were several "mitigating factors." *Id.* Two of these factors are particularly significant here: (1) "The reference to parole was not emphasized by the witness or the prosecution"; and (2) "the court's offer to give a cautionary instruction was declined by defense counsel." *Id.*

{28} In the case at hand, these same two factors mitigate the evidence of Mc-Donald's drug use, especially in light of the inadvertent manner in which the evidence entered the trial. In terms of inadvertence, the witness only incidentally made reference to McDonald's drug use. McDonald does not assert that the prosecutor or the witness emphasized the fact that McDonald smoked marijuana. As for the cautionary instruction, the *Gibson* court noted that "[f]ailure to accept the court's offer of a cautionary instruction may in itself justify a refusal to grant a mistrial; a well-constructed instruction can dissipate the prejudice, particularly when the improper remark was somewhat ambiguous and not emphasized by the witness or counsel." *Id.* The record shows that McDonald refused the trial judge's offer to provide such an offer. He cannot say that he was without a remedy in the first instance, and we cannot say that the trial judge abused its discretion in denying his motion for a mistrial. *Cf. Callaway v. State,*

109 N.M. 416, 417, 785 P.2d 1035, 1036 (1990) (concluding that, because a witness made an unsolicited, improper remark, the trial court should have offered a cautionary instruction, rather than declaring a mistrial).

{29} Additionally, in this case, there was overwhelming evidence of the defendant's guilt, including his own statement and the testimony of an eyewitness. Under such circumstances, the admission of incidental testimony regarding drug use was harmless error. *See Woolls v. State,* 665 S.W.2d 455, 472 (Tex.Crim.App.1983) (en banc) (holding that, even if the trial court erred in admitting evidence that a criminal defendant used drugs on the day of the murder for which he was convicted, because of the overwhelming evidence of defendant's guilt, such error was harmless); *cf. Aguayo,* 114 N.M. at 132, 835 P.2d at 848 ("The present record [of a child-abuse trial] offers no obvious rationale for the admission of Defendant's prior conduct [i.e., abuse of the victim-child] ... and we cannot say from the record that the admission of such evidence did not unreasonably prejudice the minds of the jurors"); *People v. Foster,* 182 A.D.2d 701, 582 N.Y.S.2d 734, 735 (App.Div.1992) (mem.) (holding in the alternative evidence of drug use, if erroneously admitted, harmless).

## III. CONCLUSION

{30} For all of the above reasons, the judgment of the District Court is affirmed.

{31} **IT IS SO ORDERED.**

BACA, MINZNER, SERNA and McKINNON, JJ., concur.