2000-NMCA-106

16 P.3d 1113

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Rolf HUEGLIN, Defendant–Appellant.**

No. 20,461.

Court of Appeals of New Mexico.

Nov. 14, 2000.

Patricia A. Madrid, Attorney General, Ralph E. Trujillo, Assistant Attorney General, Santa Fe, NM, for Appellee.

Ron Koch, Stephen C.M. Long, Ron Koch, P.A., Albuquerque, NM, for Appellant.

## OPINION

ALARID, Judge.

{1} Defendant, Rolf Hueglin, appeals from his convictions for criminal sexual penetration in the second degree, criminal sexual penetration in the third degree and criminal sexual penetration in the fourth degree. We find no error and affirm.

## BACKGROUND

{2} Defendant owned and operated the Black Forrest Bakery in Albuquerque, New Mexico. Defendant owned a rental house behind the bakery. The victim, 38–year–old Janis Sedillo (Victim), has Down Syndrome. Victim lived with a caretaker in the house next door to the rental house owned by Defendant.

{3} Victim and her caretaker had a passing acquaintance with Defendant. On a Sunday in March 1997, Defendant left a phone message inviting Victim and her caretaker to come to the bakery on Monday to watch Defendant prepare some Easter specialities. Because the caretaker had to work on Monday, she made arrangements for Victim's uncle to take Victim to the bakery. On Monday, the uncle took Victim to the bakery and left her there. The bakery was closed on Mondays. Defendant and one employee were present. Defendant gave Victim a tour of the bakery. It was apparent to Defendant that Victim had a speech defect and was physically handicapped. Defendant showed Victim how he made various Easter specialties. The demonstration lasted about an hour. During the demonstration, Defendant

complained that his back hurt. This comment lead to a discussion of back massage.

{4} After the demonstration was over, Defendant began to walk Victim home. Rather than going straight home, Defendant and Victim stopped off at the rental house, ostensibly so that Defendant could give Victim a massage.

{5} The jury was presented two widely divergent accounts of what followed. According to Defendant, Victim lay down on a rug. They began to hug and kiss. Victim was sexually excited. Defendant helped her to pull down her pants. He attempted to penetrate her, but was unsuccessful. He caressed her vaginal area. She took his penis into her hands and he ejaculated. At no time was there any indication that Victim wanted Defendant to stop.

{6} Victim testified that as she was standing on the rug, Defendant hit her on the back, knocking her to her knees. Defendant then gave her a forceful, painful massage. She tried to stop Defendant by striking him. He punched her in the stomach, chest and face. Victim took off her glasses and Defendant hit her repeatedly in the nose and eyes. Defendant sexually assaulted Victim. He took a leather weight-lifting belt and repeatedly hit Victim. Victim's mouth bled from the repeated punches; she was scratched and bruised.

{7} Victim reported the encounter with Defendant. She was taken to a hospital and given a detailed forensic examination by a nurse. The nurse observed a laceration between Victim's vagina and anus. The nurse believed that the laceration was consistent with penetration of the vagina by a finger. There was a bruise or bite mark on Victim's breast. The nurse found no evidence of the severe beating described by Victim.

{8} Defendant was indicted and tried on seven charges: Count 1, kidnapping; Count 2, second degree criminal sexual penetration (penetration of vagina resulting in laceration of posterior fourchette); Count 3, third degree criminal sexual penetration (penetration of vagina with finger); Count 4, third degree criminal sexual penetration (penetration of anus with finger); Count 5, bribery of a witness; Count 6, fourth degree criminal sexual contact (touching unclothed breast) and, Count 7, attempt to commit third degree criminal sexual penetration.

{9} Prior to trial, the State and Defendant filed cross-motions addressing the admissibility of Victim's prior sexual activity. The State also moved pursuant to NMSA 1978, § 38–6–8 (1993) for an order permitting the taking of Victim's testimony by videotape deposition. In support of its motion, the State alleged that Victim "is mentally retarded with a mental age of five years and ten months" and that "[d]ue to her mental retardation [Victim] has similar vulnerabilities as that of a child." The State listed Ned Siegel, Ph.D, as a witness in support of its motion to videotape Victim. Defendant filed a motion to preclude Dr. Siegel from testifying at trial that Victim was incapable of consenting to sex or that she was incapable of lying.

{10} The trial court conducted an omnibus hearing on the various pre-trial motions. The trial court granted the State's motion to exclude evidence of Victim's sexual history, ruling that evidence relating to an alleged rape of Victim that occurred 25 years earlier was inadmissible. The trial court took under advisement Defendant's motion to introduce evidence of Victim's sexual history to the extent such evidence might relate to the issues of consent or lack of consent.

{11} Dr. Siegel testified in support of the State's motion to present Victim's testimony by videotape deposition. He was cross-examined in some detail regarding his qualifications, his opinions and the methods employed to arrive at those opinions. Dr. Siegel described the substantial limitations imposed by Down Syndrome on Victim's mental capacity. In view of Dr. Siegel's testimony describing the effects of Down Syndrome on Victim's mental capacity, Defendant argued that Victim was not competent to testify as a witness, whether by videotape or otherwise. The trial court overruled Defendant's objection and granted the State's motion to present Victim's testimony by videotape. With respect to Defendant's motion to exclude Dr. Siegel's opinions, the trial court ruled that Dr. Siegel would be permitted to testify as an expert, subject to such objections as De-

fendant might interpose at trial in response to specific lines of questioning.

{12} Defendant's case was tried to a jury. Victim's videotaped deposition testimony was shown to the jury. Dr. Siegel testified about the effects of Down Syndrome on Victim's mental capacity, including the relationship of Down Syndrome to Victim's ability to understand the consequences of sexual activity and to consent to sexual activity.

{13} Defendant was convicted on Counts 2, 3, and 6, and acquitted on Counts 1, 4, and 5. Count 7 was dismissed by the trial court at the conclusion of the evidence.

## DISCUSSION

### Issue 1: Qualifications of Dr. Siegel as an Expert

{14} A trial court has broad discretion in its ruling on the qualifications of an expert. *State v. McDonald,* 1998–NMSC–034, ¶ 19, 126 N.M. 44, 966 P.2d 752. Here, Dr. Siegel, the State's expert, testified that he is a clinical psychologist with a Ph.D. in psychology. Dr. Siegel testified to extensive clinical experience with developmentally disabled people in general and persons with Down Syndrome in particular. Although Dr. Siegel conceded that his work during the past eighteen years has not focused on the developmentally disabled, he testified that accepted principles of psychological testing and competency applicable to persons with Down Syndrome had not changed over that time. Defendant did not offer any expert testimony contradicting Dr. Siegel on this point. We conclude that the trial court did not abuse its discretion in accepting Dr. Siegel as qualified to testify regarding Victim's mental capacity.

### Issue 2: Whether Dr. Siegel's Testimony Assisted the Jury

{15} Defendant argues that Dr. Siegel's testimony that Victim could not understand the nature and consequences of the sex act did not meet the requirement that such testimony "will assist the trier of fact," Rule 11–702 NMRA 2000, because Victim's ability to comprehend the nature and consequences of sex was within the competence of a lay person. Defendant argues that rather than assisting the jury, Dr. Siegel's testimony led the jury to reach inconsistent verdicts. We review the trial court's ruling for an abuse of discretion. *Coates v. Wal–Mart Stores, Inc.,* 1999–NMSC–013, ¶ 39, 127 N.M. 47, 976 P.2d 999.

{16} As an initial matter, we note that it is well established that under Fed. R.Evid. 702—on which Rule 11–702 is based—expert testimony that overlaps an area of knowledge within the comprehension of the jury is not subject to automatic exclusion. 4 Weinstein's Federal Evidence § 702.03[2] (2d ed.). We conclude that this principle is equally applicable to Rule 11–702. Further, we have reviewed Dr. Siegel's trial testimony and conclude that the jury would have found his testimony to be helpful in understanding how Down Syndrome affected Victim's mental capacity. Although some—if not most—of the jurors were likely to have been familiar with the term "Down Syndrome," we doubt that a typical juror would have had the detailed information about the effects of Down Syndrome provided by Dr. Siegel's testimony. Dr. Siegel's testimony assisted the jury in understanding why Victim's biological age was not an accurate guide to her understanding of the nature and consequences of the sexual acts to which she was subjected to by Defendant.

{17} Moreover, we think that Defendant misreads the jury's verdict. The fact that the jury convicted Defendant on counts 2, 3, and 6, yet answered "no" to the special interrogatory inquiring "if the crimes were committed against a person who is physically or mentally helpless, and that person was intentionally injured," suggests that the jury: (1) believed Defendant's testimony that he thought Victim was a willing partner in sexual contact; and (2) correctly followed the instructions applicable to counts 2, 3, and 6, under which Victim's willingness to have sex was immaterial if Victim in fact was unable to understand the consequences of sexual activity with Defendant. Thus, the jury reasonably could have found that the laceration of Victim's posterior fourchette was accidentally inflicted by Defendant in the course of what he believed to be mutually agreeable sexual activity. We find no inconsistency in

58

the jury's guilty verdicts and its answers to the special interrogatories.

{18} The trial court did not abuse its discretion in finding that Dr. Siegel's testimony would assist the trier of fact.

### Issue 3: Whether Dr. Siegel's Opinion was Founded on an Acceptable Scientific Basis

{19} Citing *State v. Torres,* 1999–NMSC–010, ¶ 24, 127 N.M. 20, 976 P.2d 20, Defendant argues that the State failed to establish the scientific validity of the Stanford–Binet intelligence test, the principal test employed by Dr. Siegel to determine Victim's mental capacity. The State responds that Defendant failed to preserve the argument that he now makes on appeal.

{20} We agree with the State. At the pre-trial hearing, Defendant argued that Dr. Siegel's testimony would not assist the jury. Although Defendant referred to *State v. Alberico,* 116 N.M. 156, 861 P.2d 192 (1993), and referred to the Stanford Binet and Wechsler intelligence tests in passing, we find nothing in Defendant's written motion in limine or in the transcript of the hearing that would have fairly alerted the trial court to the argument now made on appeal that the State failed to establish the scientific validity of the Stanford Binet test as a tool for measuring the intelligence of late-twentieth-century-American adults with Down Syndrome. We hold that Defendant waived this claim of error by failing to state the "specific ground of objection." Rule 11–103(A)(1) NMRA 2000.

### Issue 4: Whether Victim was Competent to Testify

{21} Defendant argues that the trial court abused its discretion in admitting the testimony of Victim. Both parties have referred the Court to *State v. Manlove,* 79 N.M. 189, 192, 441 P.2d 229, 232 (Ct.App. 1968) as stating the appropriate standard for determining Victims's competency to testify. We note that *Manlove* predates the adoption of the New Mexico Rules of Evidence. *See* NMSA 1953, § 20-4-101, Compiler's Notes (setting out text of April 26, 1973 Order

declaring the Rules of Evidence to govern cases filed after July 1, 1973).

{22} Pursuant to Rule 11–601 NMRA 2000, "[e]very person is competent to be a witness except as otherwise provided in these rules." Rule 11–601 is identical to the first sentence of Rule 601 of the Federal Rules of Evidence. *Compare* Rule 11–601 *with* Fed.R.Evid. 601. According to a leading commentator on the federal rules, "Rule 601 completes the restructuring of the judge's and jury's functions that began when courts and legislatures began abrogating rules of disqualification. The Rule represents the culmination of the trend that has converted questions of competency into questions of credibility. . . ." 3 Weinstein, *supra,* § 601.02[1] (references to historical appendices omitted). According to the Advisory Committee Note to the original version of Federal Rule 601, "[a] witness wholly without capacity is difficult to imagine. The question is one particularly suited to the jury as one of weight and credibility. . . ." Weinstein, *supra* § 601App.01[2]. Under Rule 601, the trial court's role is to insure that "[w]itnesses . . . meet a minimum standard regarding the matters on which they will testify, the minimum necessary to permit any reasonable person to put any credence in their testimony." Weinstein, *supra,* § 601.03[1][a]. We find these principles persuasive in the context of New Mexico's parallel rule, Rule 11–601.

{23} In the present case, the trial court did not abuse its discretion in concluding that this minimum standard had been met. Dr. Siegel testified that Victim's mental age is equivalent to that of "a person slightly below six years of age . . . she scored about like—someone like a six year old child." According to Dr. Siegel, Victim had an IQ of 36 and was moderately mentally retarded. In his view, Victim's "gross mental capacity" was "really no different" than that of a six-year-old child. Dr. Siegel testified that Victim "would have and does have a concrete simple understanding of [the difference between a truth and a lie]. For [her] truth is telling what she remembers as best as she can remember it and a lie would be something else than that." On cross-examination, Dr.

Siegel explained that "when we talk about duty [to tell the truth], if you said you'd tell the truth to her, the truth will be saying what she remembers, not in a very sophisticated way, but only in the sense that when you ask a six year old to tell the truth." During her video-taped deposition, Victim testified that she understood that she could get in "big trouble" if she failed to tell the truth. Victim promised the trial court that she would tell the truth.

■ {24} To be competent, a witness is required to have a basic understanding of the difference between telling the truth and lying, coupled with an awareness that lying is wrong and may result in "some sort of punishment." *State v. Fairweather*, 116 N.M. 456, 461, 863 P.2d 1077, 1082 (1993); *see also* Robin W. Morey, *The Competency Requirement for the Child Victim of Sexual Abuse: Must We Abandon It?*, 40 U. Miami L.Rev. 245, 269 (1985). Under *Manlove*, as modified by Rule 11–601, the trial court did not abuse its discretion in admitting the video-taped deposition testimony of Victim.

### Issue 5: Victim's Sexual History

■ {25} Defendant argues that he was denied the opportunity to inquire into two areas of Victim's sexual history: (1) an alleged prior rape that occurred some 25 years earlier, and (2) Victim's relationship with her boyfriend, "Danny."

{26} Defendant argues that "the reason [Defendant] wanted to inquire into this earlier rape was a belief that it actually occurred and that [Victim] was somehow recalling the violence of that rape and applying it [to] her encounter with [Defendant]." We find no indication in the record that Defendant presented this argument in a manner that would have fairly alerted the trial court to Defendant's intention to use the evidence of the earlier rape incident for this specific purpose. Our review of the record indicates that Defendant argued somewhat vaguely that evidence of the prior rape went to "knowledge of the sexual awareness and especially if she'd gone through a traumatic experience like that on another occasion." Defendant did not enlarge on what he meant in referring to a "traumatic experience like that on

another occasion" nor did he tender any expert psychological testimony establishing the likelihood that Victim would have conflated the prior rape and her sexual encounter with Defendant. In the absence of expert testimony explaining how the prior incident would have affected Victim's recollection of her encounter with Defendant, Defendant would have been inviting the jury to engage in speculation based on lay psychology. Under these circumstances, the trial court did not abuse its discretion under Rules 11–403 and 11–413 NMRA 2000 in prohibiting inquiry into the alleged prior rape.

■ {27} Our review of the record indicates that the trial court did not categorically preclude Defendant from inquiring about Victim's relationship with her boyfriend. The trial court ruled as follows:

I'm going to grant the [State's] motion in limine as to exclude this particular thing that happened 25 years ago that nobody really knows what's going on, it sounds like. But as to [Defendant's] motion, *I'm going to take that under advisement at the trial,* ... I'm excluding prior sexual activity, but I don't really think you're really speaking about prior sexual activity. *I'm going to have to hear it. I'm not precluding you from going into some of these matters that show consent or lack of consent, okay?*

(Emphasis added). Our review of the video-taped transcript of Victim's testimony reveals that when Victim referred to her relationship with her boyfriend "Danny" during cross-examination, Defendant did not even attempt to enlarge on Victim's relationship with her boyfriend. At trial, during cross-examination of Dr. Siegel, Defendant did not inquire of Dr. Siegel whether, in formulating his opinion that Victim was incapable of understanding the consequences of sex, he had considered Victim's current sexual relationships. *See* Rule 11–703 NMRA 2000. Defendant was not precluded from developing this line of questioning; rather, he simply never pursued it.

### CONCLUSION

{28} We reject Defendant's claims of error and affirm the judgment of the trial court.

{29} **IT IS SO ORDERED.**

RICHARD C. BOSSON, Judge, and
MICHAEL D. BUSTAMANTE, Judge,
concur.