168 P.3d 169 (2007)
2007-NMCA-126
STATE of New Mexico, Plaintiff-Appellee,
v.
Ronnie John ROSS, Defendant-Appellant.
No. 26,239.
Court of Appeals of New Mexico.
June 29, 2007.
Certiorari Denied September 6, 2007.
Certiorari Granted September 17, 2007.
*171 Gary K. King, Attorney General, Santa Fe, NM, M. Victoria Wilson, Assistant Attorney General, Albuquerque, NM for Appellee.
Albright Law & Consulting, Jennifer R. Albright, Albuquerque, NM, for Appellant.
Certiorari Denied, No. 30,573, September 6, 2007.
Certiorari Granted, No. 30,564, September 17, 2007.

OPINION
SUTIN, Chief Judge.
{1} Defendant Ronnie John Ross was convicted by a jury of driving while intoxicated, contrary to NMSA 1978, § 66-8-102 (2004) (amended 2005); aggravated fleeing a law enforcement officer, contrary to NMSA 1978, § 30-22-1.1 (2003); failure to maintain a traffic lane, contrary to NMSA 1978, § 66-7-317 (1978); and driving on the wrong side of a roadway, contrary to NMSA 1978, § 66-7-308 (1978). Defendant appeals, arguing that the district court fundamentally erred by making a certain comment to the jury, that the district court erred in refusing to grant his motion to suppress the results from a blood alcohol test, and that the district court erred by refusing to grant Defendant's motion for a directed verdict on the charge of aggravated fleeing. We reverse Defendant's conviction for aggravated fleeing and affirm his remaining convictions.
BACKGROUND
{2} On June 20, 2004, an officer of the Farmington Police Department responded to a call about a possible drunk driver. He located the vehicle in question and started to follow it. He saw the vehicle drift out of its lane, at which point he activated his emergency lights and siren in an attempt to stop the vehicle. However, Defendant, the driver of the vehicle, did not pull over and instead drove away from the officer. Defendant drove down a center turn lane, nearly striking a median, and then drove eastbound in a westbound lane of traffic. Another vehicle had to abruptly stop in order to avoid colliding with Defendant. Shortly thereafter, Defendant pulled into a parking lot, proceeded northbound, then turned westbound, and parked in a parking space on the north side of the lot. Defendant attempted to quickly get out of his vehicle, ignored the officer's order to remain in the vehicle, and the officer sprayed him with pepper spray (OC spray), took him to the ground, and held him with his firearm at a low-ready position until backup arrived. There were four passengers still in the vehicle. Once backup arrived, the officer handcuffed Defendant and advised him of the New Mexico Implied Consent Act. NMSA 1978, §§ 66-8-105 to -112 (1978, as amended through 2003) (amended 2005 and 2006). According to the officer, Defendant "acknowledged understanding the [a]dvisory" and "agreed to the blood draw." Defendant told the officer that he was asthmatic, so the officer took Defendant to an emergency room for a blood draw and for treatment of the possible effects of the OC spray. At the emergency room, the officer again advised Defendant of the New Mexico Implied Consent Act. This time, Defendant responded by acknowledging that he understood and requested an attorney. The officer told Defendant that he did not have the right to consult with an attorney under the New Mexico Implied Consent Act. According to the officer, Defendant at this point agreed to the blood draw. The officer also testified that he requires *172 individuals to respond to his request for consent by saying "yes" or "no" and that Defendant agreed to be tested.
{3} Defendant filed a pro se motion to exclude the results of the blood draw. His attorney also filed a motion to exclude the results. The court held a hearing on the matter. No testimony was taken, but defense counsel argued that Defendant's request for an attorney constituted a refusal of the blood draw and that there was no signed consent form, so there was not sufficient evidence that the refusal was adequately cured. The State did not dispute Defendant's contention that the request for an attorney was a refusal; rather it argued that Defendant, after requesting an attorney, affirmatively consented and thereby cured his refusal. The State never disputed Defendant's contention that the request for an attorney was a refusal. The district court found that "Defendant did not refuse to submit to a blood draw." The court denied the motion to suppress the results of the blood draw.
{4} The case proceeded to a jury trial. After the jury was selected, but before the rest of the jury pool was dismissed, the district court judge thanked the pool for their service and, in the presence of the jury, stated:
[W]e as Americans have more rights than any people in the world. . . . We all have them, but the only way to protect them, you have to have some way to protect them, or to take action against somebody who violates your rights, this is the way you do that, this is the most important thing we do in courtrooms all across this country. . . . This is how we really protect the constitution, so I appreciate your being here.
According to Defendant's brief in chief, the judge looked at Defendant when discussing having recourse against someone who violated "your" rights. Defendant did not take any action to make the gesture a matter of record, nor did Defendant object based on the judge's statement.
{5} At trial, the officer testified about the Farmington Police Department's pursuit policy. He stated that the policy required that a pursuing officer be in a marked police vehicle with siren and emergency lights visible to the front for a distance of five hundred feet. He testified that pursuant to the policy he also must determine, before pursuit, whether the vehicle poses a threat to the general public and whether the driver is operating the vehicle in an inattentive or dangerous manner with willful, wanton disregard for others. The officer testified that he followed the policy. The officer also testified that he did not know whether the Farmington Police Department's pursuit policy is pursuant to the Law Enforcement Safe Pursuit Act, NMSA 1978, §§ 29-20-1 to -4 (2003) (the Pursuit Act).
{6} After the State rested, Defendant moved for a directed verdict on the charge of aggravated fleeing and argued that the State failed to present sufficient evidence that the officer was following a procedure adopted pursuant to the Pursuit Act. The district court denied the motion. Defendant was convicted of driving while intoxicated, aggravated fleeing, failure to maintain a traffic lane, and driving on the wrong side of the roadway.
DISCUSSION
{7} Defendant appeals his convictions on three grounds. He argues that it was fundamental error for the district court to state to the jury pool that there must be recourse for someone violating "your" constitutional rights, while glancing at Defendant. He also argues that the district court erred in denying his motion to exclude the evidence of his blood alcohol content, contending that he refused to consent to the blood draw and that the State failed to prove the refusal was cured. Finally, he argues that the State failed to prove that the officer was following a pursuit policy that is in accordance with the Pursuit Act.
The District Court Judge's Statement Did Not Constitute Fundamental Error
{8} Defendant argues that the district court judge made a statement indicating bias against Defendant to the jury pool, with the jury present, that Americans must have some way "to take action against somebody *173 who violates your rights" and looked at Defendant when making that statement. Although Defendant did not object to the statement and did not make the judge's glance toward Defendant a matter of record, he argues that the judge's statement and glance constituted fundamental error because it created the appearance of partiality, and could have left the jury with the impression that the judge believed that Defendant was guilty.
{9} Fundamental error occurs when the "defendant's innocence appears indisputable or if the question of his [or her] guilt is so doubtful that it would shock the conscience to permit the conviction to stand." State v. Reyes, 2002-NMSC-024, ¶ 42, 132 N.M. 576, 52 P.3d 948 (internal quotation marks and citation omitted) (alteration in original). "Fundamental error only applies in exceptional circumstances when guilt is so doubtful that it would shock the judicial conscience to allow the conviction." State v. Watchman, 2005-NMCA-125, ¶ 11, 138 N.M. 488, 122 P.3d 855 (internal quotation marks and citation omitted). "In determining whether a judge has exceeded the bounds of acceptable conduct, the proceedings must be viewed as a whole. The critical inquiry is whether the trial judge's behavior was so prejudicial that it denied [the appellants] a fair, as opposed to a perfect[,] trial." State v. McDonald, 1998-NMSC-034, ¶ 16, 126 N.M. 44, 966 P.2d 752 (internal quotation marks and citation omitted) (alterations in original).
{10} We reject Defendant's fundamental error argument on two grounds. First, as the State argues, Defendant made no effort to make the district court judge's action of looking at Defendant a matter of record, such as by objecting out of the presence of the jury and stating for the record or testifying, if necessary, that the judge looked at Defendant. Even though Defendant raises this argument as one of fundamental error, he still bears the burden, as the appellant, of creating an adequate record for us to review the issues on appeal. State v. Jim, 107 N.M. 779, 780, 765 P.2d 195, 196 (Ct.App.1988) ("It is defendant's burden to bring up a record sufficient for review of the issues he raises on appeal."). Defendant has not done so.
{11} Second, and moreover, even if we assumed that the district judge looked at Defendant when he made the statement, we would not find fundamental error. Defendant cites State v. Paiz, 1999-NMCA-104, ¶¶ 25-28, 127 N.M. 776, 987 P.2d 1163, and State v. Sanchez, 112 N.M. 59, 66, 811 P.2d 92, 99 (Ct.App.1991), for support. In Paiz, this Court found plain error, not fundamental error, where the metropolitan court judge, among other things, excessively questioned witnesses, interrupted the defense counsel's questioning with a sarcastic question, which exhibited bias against the defendant and mischaracterized the evidence. 1999-NMCA-104, ¶¶ 19-20, 25, 127 N.M. 776, 987 P.2d 1163. In Sanchez, we found error where the district court judge stated in front of the jury, in ruling on a request that a witness be declared unable to testify due to a faulty memory, that the witness's testimony was worthless. 112 N.M. at 65-66, 811 P.2d at 98-99. In Sanchez, the defendant preserved the issue by requesting a mistrial based on the statement. Id. at 65, 811 P.2d at 98.
{12} Having listened to the audio recording of the proceedings in this case, we find this case clearly distinguishable from Paiz and Sanchez. In Paiz, the issue was plain error, not fundamental error, which is reviewed under a different standard. 1999-NMCA-104, ¶ 25, 127 N.M. 776, 987 P.2d 1163; see also State v. Torres, 2005-NMCA-070, ¶ 9, 137 N.M. 607, 113 P.3d 877 ("The plain error doctrine is not as strict as the doctrine of fundamental error in its application."). Also, there were several errors in Paiz, whereas, in this case, Defendant has pointed only to one, isolated comment. See Paiz, 1999-NMCA-104, ¶ 31, 127 N.M. 776, 987 P.2d 1163. In Sanchez, the issue was preserved and the comment was one about the value of certain evidence. 112 N.M. at 65, 811 P.2d at 98. In the present case, the issue was not preserved and the comment was about the justice system in general, rather than any evidence, before the trial even began.
{13} Further, in Paiz and Sanchez the statements were clearly biased against the defendants, whereas in this case, the judge's statement was ambiguous. As Defendant argues, the judge may have been implying or *174 the jury might have interpreted the judge to be implying that Defendant violated the jury members' rights by driving in a dangerous manner while intoxicated. However, given the context of the statement in a monologue about the function of a jury in the American court system, it is just as likely that the judge meant or the jury understood the judge to mean that our court system is designed to protect all citizens' constitutional rights. Without more of a record, we cannot say with any degree of probability what the judge's statement meant or how the jury might have interpreted the statement. Given the ambiguity of the statement and the fact that it is the only instance of a purported display of partiality, we cannot say that the statement amounts to fundamental error. See State v. Barber, 2004-NMSC-019, ¶ 8, 135 N.M. 621, 92 P.3d 633 ("The doctrine of fundamental error applies only under exceptional circumstances and only to prevent a miscarriage of justice."); cf. McDonald, 1998-NMSC-034, ¶¶ 9, 16-17, 126 N.M. 44, 966 P.2d 752 (holding that a judge's single question, which was ambiguous, did not amount to reversible error); State v. Lucero, 110 N.M. 50, 51, 791 P.2d 804, 805 (Ct.App. 1990) (concluding that a judge's ambiguous statement did not amount to reversible error).
{14} Further, in this case the officer's testimony provided evidence that Defendant fled from the officer, drove the wrong way on the street, and drifted out of his lane. The blood draw results were .22, which is sufficient to establish that Defendant drove with an unlawful blood alcohol concentration. Defendant's innocence does not appear indisputable, nor is the evidence of guilt doubtful, much less so doubtful that it would shock the conscience to permit his conviction to stand. See Reyes, 2002-NMSC-024, ¶ 42, 132 N.M. 576, 52 P.3d 948.
{15} Under the circumstances, the judge's statement to the jury pool did not constitute fundamental error.
The District Court Did Not Err in Determining That Defendant Consented to a Blood Draw and in Admitting the Test Results
{16} Defendant argues that the district court erred in admitting the blood alcohol content results. A motion to suppress involves mixed questions of fact and law. State v. Vandenberg, 2003-NMSC-030, ¶¶ 17-19, 134 N.M. 566, 81 P.3d 19. We review factual questions for sufficiency of the evidence, viewing the facts most favorable to the district court's decision. Id. "When reviewing the denial of a motion to suppress, we must determine whether the law was correctly applied to the facts, viewing them in a manner most favorable to the prevailing party; all reasonable inferences in support of the court's decision will be indulged in, and all inferences or evidence to the contrary will be disregarded." State v. Duquette, 2000-NMCA-006, ¶ 7, 128 N.M. 530, 994 P.2d 776 (internal quotation marks and citation omitted). Whether Defendant refused to submit to a blood test is a question of fact for the court to determine. See State v. Grossman, 113 N.M. 316, 319-20, 825 P.2d 249, 252-53 (Ct.App.1991) (holding that there was "sufficient evidence to uphold the trial court's finding of consent").
{17} The New Mexico Implied Consent Act states that "[a]ny person who operates a motor vehicle . . . shall be deemed to have given consent . . . to chemical tests . . . for the purpose of determining the drug or alcohol content of his blood." § 66-8-107(A). If the person is arrested for driving while intoxicated and refuses testing, he is not to be tested unless the officer obtains a search warrant. § 66-8-111(A).
{18} Defendant contends that the court did not have sufficient evidence to admit the blood test evidence. In contending this, Defendant argues, without authority, that "[t]he law indicates that it is the spirit of the communication that matters. Exact wording is not important. If a defendant appears to be seeking to withdraw consent, the government must err on the side of caution and seek a warrant." Further, Defendant, again without authority, argues that the officer had a duty to make an "effort to determine whether [Defendant] was making a refusal."
{19} The evidence presented was that Defendant asked to speak to an attorney, that *175 the officer advised him that he did not have the right to speak to an attorney under the Implied Consent Act, and that thereafter Defendant consented to the blood draw. See Rackoff v. State, 281 Ga. 306, 637 S.E.2d 706, 707 (2006) (holding that "an individual is not entitled to the advice of counsel when he is asked to submit to a breath test under the Implied Consent Law"). We conclude that the evidence supported the district court's determination that Defendant did not refuse consent or refuse the blood draw. Asking to speak to an attorney is not the same as saying "No, I do not agree or consent" and is not, in and of itself, a refusal. In addition, the officer testified that Defendant consented after being informed that he did not have a right to an attorney under the Implied Consent Act. Neither the officer nor any other witness testified that Defendant ever stated that he did not agree or consent to a blood draw. Construing all reasonable inferences in favor of the district court's decision, we believe there is sufficient evidence that Defendant's request to speak to an attorney was not a refusal of consent or refusal to submit to the blood draw. Therefore, we affirm the district court's denial of the motion to suppress.
The District Court Erred in Denying Defendant's Motion for Directed Verdict on the Charge of Aggravated Fleeing
{20} Defendant argues that the State failed to present sufficient evidence that the Farmington Police Department's pursuit policy is in compliance with the Pursuit Act. "The question presented by a directed verdict motion is whether there was substantial evidence to support the charge." State v. Rael, 1999-NMCA-068, ¶ 5, 127 N.M. 347, 981 P.2d 280 (internal quotation marks and citation omitted). However, when statutory interpretation is required to evaluate a motion for directed verdict, we review the issue de novo. Id.
{21} The aggravated fleeing statute, in pertinent part, reads:
Aggravated fleeing a law enforcement officer consists of a person willfully and carelessly driving his vehicle in a manner that endangers the life of another person after being given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or other signal, by a uniformed law enforcement officer in an appropriately marked law enforcement vehicle in pursuit in accordance with the provisions of the Law Enforcement Safe Pursuit Act.
§ 30-22-1.1(A). Section 29-20-4 of the Pursuit Act requires law enforcement agencies to "establish and enforce a written policy governing the conduct of law enforcement officers . . . who are involved in high speed pursuits." § 29-20-4(A).
{22} In State v. Padilla, 2006-NMCA-107, ¶ 13, 140 N.M. 333, 142 P.3d 921, cert. granted, 2006-NMCERT-008, 140 N.M. 424, 143 P.3d 186, this Court held that in order to prove that a defendant has committed aggravated fleeing, the State must prove as an element of the crime that the pursuit was, as stated in Section 30-22-1.1(A), in accordance with the provisions of the Pursuit Act. Padilla further held that there are two steps to prove that a pursuit was made in accordance with the Pursuit Act. Id. ¶ 20. This Court stated that "(1) if the issue is contested, the judge may decide whether the local pursuit policy complies with the requirements of the Act andif sothen (2) the jury determines whether the officer's pursuit of a defendant complied with that local pursuit policy." Id. Section 29-20-4(C) of the Pursuit Act specifically requires that local policies state, at a minimum, that:
(1) a law enforcement officer may initiate a high speed pursuit to apprehend a suspect who the officer has reasonable grounds to believe poses a clear and immediate threat of death or serious injury to others or who the officer has probable cause to believe poses a clear and immediate threat to the safety of others that is ongoing and that existed prior to the high speed pursuit;
(2) a law enforcement officer shall not initiate or continue a high speed pursuit when the immediate danger to the officer and the public created by the high speed pursuit exceeds the immediate danger to the public if the occupants of the motor vehicle being pursued remain at large;

*176 (3) when deciding whether to initiate or continue a high speed pursuit, the following factors, at a minimum, shall be taken into consideration:
(a) The seriousness of the offense for which the high speed pursuit was initiated;
(b) whether a suspect poses a clear and immediate threat of death or serious injury to others;
(c) road, weather, environmental and vehicle conditions;
(d) the amount of motor vehicle and pedestrian traffic; and
(e) knowledge of the suspect's identity, possible destination and previous activities that may make apprehension at a later time feasible; and
(4) no more than two law enforcement vehicles shall become actively involved in a high speed pursuit, unless specifically authorized by a supervisor.
{23} Defendant argues solely that there was insufficient evidence that the Farmington Police Department's pursuit policy complied with the Pursuit Act. As Defendant notes, whether a local police department's pursuit policy complies with the Pursuit Act is a question of law for the district court. Padilla, 2006-NMCA-107, ¶ 20, 140 N.M. 333, 142 P.3d 921; see State v. Attaway, 117 N.M. 141, 145, 870 P.2d 103, 107 (1994) (holding that the question of whether exigent circumstances exist, which requires applying the law to the facts, is a question that is properly reviewed de novo).
{24} Defendant's argument hinges on the fact that the officer stated that he did not know if the Farmington Police Department's pursuit policy was in accordance with the Pursuit Act. However, we hold that the officer's knowledge as to whether the local policy is in compliance with the Pursuit Act is irrelevant. Instead, the court must determine as a matter of law whether the local policy is in compliance with the Pursuit Act. Padilla, 2006-NMCA-107, ¶ 20, 140 N.M. 333, 142 P.3d 921. In this case, the policy itself was not introduced as evidence. Only after the motion for directed verdict was made did the State offer a copy of the policy to the district court. The court declined to take judicial notice of the policy, reminding counsel that she could not testify in the case. The officer, however, described the policy in his testimony at trial. The officer testified that the Farmington Police Department's pursuit policy required that the fleeing person pose a threat to the general public and that the fleeing person drive in an inattentive or dangerous manner with a wanton disregard for other persons. We recognize that the Pursuit Act requires these circumstances to be taken into account by an officer when determining whether to pursue an individual. § 29-20-4(C)(1). However, the officer's testimony does not establish that each of the minimal requirements were met. For example, the officer did not testify that the policy required the officer to assess the danger to the public if the occupants of the pursued vehicle remain at large. See § 29-20-4(C)(2). Nor did he testify to the requirement that other factors be considered, such as the seriousness of the offense, the amount of motor vehicle and pedestrian traffic, information about the suspect, and the road, weather, environmental, and vehicle conditions. See § 29-20-4(C)(3). In fact, the officer's testimony described only one subsection out of four subsections of requirements. See § 29-20-4(C). We conclude that in this case, there was insufficient evidence on which the district court could conclude that the local policy complied with the Pursuit Act. The officer's testimony did not address the majority of the requirements of Section 29-20-4 that serve to balance the danger posed by Defendant's actions in fleeing the officer with the danger posed by the officer engaging in a high speed pursuit. See Padilla, 2006-NMCA-107, ¶ 2, 140 N.M. 333, 142 P.3d 921 (stating that the laws relating to police pursuits were recently enacted in response to the debate regarding the risks posed by high speed police pursuits). We therefore conclude that the district court erred in determining that the local policy met the requirements of the Act. Accordingly, one element of the crime of aggravated fleeing was not proved, and the directed verdict should have been granted. As a result, we reverse Defendant's conviction for aggravated fleeing.
{25} Finally, we note that the State asks us to overrule Padilla. Padilla addresses most of the State's arguments in favor of overruling it. See Padilla, 2006-NMCA-107, ¶¶ 14, 18, 140 N.M. 333, 142 P.3d 921 (stating *177 that "because the training and filing requirements of the Act do not directly mandate how police conduct a particular pursuit, we think those requirements are not included in the evaluation of whether a given pursuit was conducted in accordance with the provisions of the [Act]," and addressing the State's argument that requiring the jury to make certain evaluations is unduly burdensome (alteration in original) (internal quotation marks omitted)). As to the State's arguments that the statute as construed in Padilla may create due process and equal protection issues, we question, but choose not to address, whether the State should be given standing to raise a denial of due process or equal protection under these circumstances. See Gunaji v. Macias, 2001-NMSC-028, ¶ 20, 130 N.M. 734, 31 P.3d 1008 (questioning on prudential grounds a party's assertion of another's constitutional rights). Padilla is before our Supreme Court on a certiorari petition. We decline to revisit Padilla.
CONCLUSION
{26} For the reasons set forth, we reverse Defendant's conviction for aggravated fleeing and affirm his remaining convictions.
{27} IT IS SO ORDERED.
WE CONCUR: CELIA FOY CASTILLO and MICHAEL E. VIGIL, Judges.