**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: **February 28, 2018**

**NO. A-1-CA-34909**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**PAUL SALAZAR,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY**
**Stephen K. Quinn, District Judge**

Hector H. Balderas, Attorney General
Maha Khoury, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**VIGIL, Judge.**

{1}     Defendant Paul Salazar appeals his convictions for one count of trafficking methamphetamine, contrary to NMSA 1978, Section 30-31-20 (2006), one count of distribution of synthetic cannabinoids, contrary to NMSA 1978, Section 30-31-22(A)(1) (2011), and one count of conspiracy to traffic methamphetamine or to distribute synthetic cannabinoids, contrary to NMSA 1978, Section 30-28-2 (1979). For the reasons that follow, we affirm Defendant's convictions.

**BACKGROUND**

{2}     The State alleged that on August 15, 2013, Nicole Ramirez, at Defendant's direction, delivered methamphetamine and the chemicals PB-22 and 5F-PB22 hidden within hygiene products (deodorant sticks) to David Patrick, an inmate confined in the Curry County Detention Center (CCDC) in Clovis, New Mexico. Additional factual and procedural background is provided in our analysis as required.

**DISCUSSION**

{3}     Defendant's appeal raises three issues. First, delay amounted to a violation of Defendant's right to a speedy trial. Second, the State failed to prove that the substances contained in the deodorant container were synthetic cannabinoids as defined under New Mexico law. Third, the State did not present sufficient evidence

to sustain Defendant's convictions because it did not call Ms. Ramirez to testify at trial.

{4}    Defendant also asserts four additional unpreserved issues, invoking either fundamental or plain error. First, the State should have charged Defendant with bringing contraband into the jail, not trafficking. Second, the district court erred in sentencing Defendant to second-degree conspiracy when the jury's finding was unclear. Third, comments made by the prosecutor during closing argument deprived Defendant of a fair trial. Fourth, the district court erred in admitting the testimony of Probation Officer Edie Barela (Officer Barela).

**I.    The Delay Did Not Violate Defendant's Speedy Trial Rights**

{5}    It took nineteen months and ten days to bring Defendant to trial on the counts charged in the State's criminal information. Based on this delay, Defendant contends that the delay violated his constitutional right to a speedy trial.

{6}    The Sixth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, *see Klopfer v. North Carolina*, 386 U.S. 213, 222-23 (1967), provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" U.S. Const. amend. VI. In determining whether "a defendant has been deprived of his constitutional right to a speedy trial, [New Mexico appellate courts] use the four-factor test set forth in *Barker*[ *v. Wingo*,

2

407 U.S. 514, 530 (1972)] balancing the length of delay, the reason for [the] delay, the defendant's assertion of the right to a speedy trial, and the prejudice to the defendant." *State v. Ochoa*, 2017-NMSC-031, ¶ 4, 406 P.3d 505. The appellate courts "defer to the district court's factual findings in considering a speedy trial claim, but weigh each factor de novo," *id.*, and consider the *Barker* factors on a "case-by-case basis." *Id.* ¶ 5. This analysis is also "not a rigid or mechanical exercise, but rather a difficult and sensitive balancing process." *Id.* (internal quotation marks and citation omitted).

**A.     Timeline of Delay in Defendant's Case**

{7}     We begin by setting forth the facts and circumstances surrounding the delays in bringing Defendant's case to trial. Defendant was arrested on September 12, 2013, and on September 30, 2013, the State filed the criminal information.

{8}     On December 5, 2013, the first pretrial conference was held, at which time trial was set for February 25, 2014. On January 8, 2014, the State moved for a continuance. The district court granted the continuance on January 24, 2014, in part because the parties still had not received results from the forensic laboratory identifying the substances found in the deodorant sticks left by Ms. Ramirez at CCDC for Mr. Patrick.

{9}     On May 29, 2014, the second pretrial conference was held and trial was set for

September 9, 2014. The State represented that it had received the forensic laboratory results, updated its witness list, and was ready for trial. Defendant also informed the district court that he was ready for trial. Defendant also communicated to the district court that he wished to be transferred to a prison facility so that he could earn good time credit while the charges in his current case were pending.

{10} On July 9, 2014, new counsel entered an appearance on behalf of Defendant, and filed Defendant's first demand for a speedy trial.

{11} Between July 29, 2014, and September 8, 2014, the district judge was unavailable for medical reasons. On August 18, 2014, the district court filed an amended notice of jury trial, rescheduling Defendant's trial for September 10, 2014. On August 29, 2014, Defendant moved for a six-month continuance in order to continue his investigation and conduct witness interviews. In this motion, Defendant waived all speedy trial claims for this period of continuance. The district court granted the continuance on September 3, 2014. However, on September 26, 2014, Defendant made his second demand for a speedy trial.

{12} On November 19, 2014, Defendant filed a motion to dismiss on speedy trial grounds due to the fact that fourteen months had passed since the time of his arrest.

{13} On November 24, 2014, a third pretrial conference was held where trial was set for January 22, 2015. The State represented that it was ready for trial. Defendant

stated that although he still had investigation and witness interviews to conduct, he would do his best to be ready for trial by January 22, 2015.

{14}   On December 17, 2014, a hearing on Defendant's motion to dismiss on speedy trial grounds was held; however, the district court reserved ruling on Defendant's motion until January 20, 2015, at which time Defendant's motion was denied.

{15}   On January 20, 2015, at jury selection, Defendant moved for a second continuance of trial on grounds that additional time was needed to set a hearing for remaining motions and to consider the State's plea offer.The motion was granted.

{16}   On February 5, 2015, a fourth pretrial conference was held, at which time trial was set for April 22, 2015. The State represented that it was ready for trial. Defendant renewed his motion to dismiss on speedy trial grounds and stated that he would be ready for trial on April 22, 2015.

{17}   On March 2, 2015, Defendant filed a motion for reconsideration of the district court's order denying his November 19, 2014 motion to dismiss on speedy trial grounds. The hearing on Defendant's motion for reconsideration was held on March 27, 2015.

{18}   On April 17, 2015, the district court denied Defendant's motion for reconsideration. The district court determined: (1) Defendant's case is an intermediate complexity case; (2) the time between the State's January 9, 2014 motion for a

5

continuance and May 29, 2014 (the date on which the State represented that it was prepared for trial) did not count against Defendant; (3) the time during which the district judge was medically unavailable (between July 29, 2014, and September 8, 2014) did not count against either the State or Defendant; (4) the delay between September 8, 2014, and the April 22, 2015 jury trial counted against Defendant based on his August 29, 2014, and January 20, 2015, requested continuances; and (5) because Defendant's probation was revoked in December 2013 and for which he was incarcerated until April 2018, Defendant was not prejudiced by his pretrial incarceration arising in the instant case.

**B.    Length of Delay**

{19}    The first *Barker* factor, "length of delay, is both the threshold question in the speedy trial analysis and a factor to be weighed with the other three *Barker* factors." *Ochoa*, 2017-NMSC-031, ¶ 12. Under *Barker*, the states are "free to prescribe a reasonable period consistent with constitutional standards" for bringing a case to trial. 407 U.S. at 523; *Ochoa*, 2017-NMSC-031, ¶ 12. Our Supreme Court established speedy trial guidelines in *State v. Garza*, 2009-NMSC-038, ¶ 2, 146 N.M. 499, 212 P.3d 387. *Garza* holds that "the length of delay necessary to trigger the speedy trial inquiry [is] twelve months for simple cases, fifteen months for cases of intermediate complexity, and eighteen months for complex cases." *Id.* (holding "that these

guidelines are merely thresholds that warrant further inquiry into a defendant's claimed speedy trial violation and should not be construed as bright-line tests dispositive of the claim itself").

{20} "When the length of delay exceeds a guideline, it must be weighed as one factor in determining whether there has been a violation of the right to a speedy trial[.]" *Ochoa*, 2017-NMSC-031, ¶ 14. "As the delay lengthens, it weighs increasingly in favor of the accused. In other words, a delay barely crossing the guideline is of little help to the defendant's claim, while a delay of extraordinary length weighs heavily in favor of the defendant." *Id.* (internal quotation marks and citation omitted). Our appellate courts "defer to the district court's finding of complexity" in a given case. *Id.* ¶ 15.

{21} Defendant was arrested on September 12, 2013. Nineteen months and ten days later, on April 22, 2015, Defendant's case was brought to trial. The district court concluded that Defendant's case was of intermediate complexity. *See State v. Montoya*, 2011-NMCA-074, ¶ 16, 150 N.M. 415, 259 P.3d 820 ("Cases of intermediate complexity . . . seem to involve numerous or relatively difficult criminal charges and evidentiary issues, numerous witnesses, expert testimony, and scientific evidence." (internal quotation marks and citation omitted)). Defendant's case was therefore delayed four months and ten days beyond the fifteen-month guideline for

7

cases of intermediate complexity. This delay meets the threshold for further speedy trial analysis. We also conclude that under the circumstances, the first *Barker* factor weighs only slightly against the State. *See id.* ¶ 17 (holding that the delay of six months beyond the fifteen-month guideline for intermediate complexity case "was not so long or protracted as to weigh more than slightly against the [s]tate").

**C.    Reason for Delay**

{22}    The second *Barker* factor requires that we evaluate the reasons for delay in the defendant's case. *Ochoa*, 2017-NMSC-031, ¶ 18. *Barker* describes three types of delay: (1) "a deliberate attempt to delay the trial in order to hamper the defense[,]" which "should be weighted heavily against the government"; (2) "negligent or administrative delay[,]" which "weighs less heavily but nevertheless weighs against the [s]tate"; and (3) "neutral delay, or delay justified by a valid reason," which "does not weigh against either party." *Id.* (alteration, internal quotation marks, and citations omitted). Additionally, "delay initiated by defense counsel generally weighs against the defendant." *Id.*; *State v. Grissom*, 1987-NMCA-123, ¶ 34, 106 N.M. 555, 746 P.2d 661 ("Delay arising from hearing defendants' motions, not caused by the prosecution, is weighed against the defendant.").

{23}    We agree with the district court's analysis that the time between the State's January 9, 2014 motion for a continuance and May 29, 2014 (the date on which the

State stated that it was prepared for trial) was administrative delay that counts against the State. We also agree with the district court that the time during which the district court judge was medically unavailable (between July 29, 2014, and September 8, 2014) was neutral delay that does not count against either the State or Defendant. *See State v. White*, 1994-NMCA-084, ¶ 5, 118 N.M. 225, 880 P.2d 322 (holding that the district court judge's surgery and recovery time did not weigh against either side in speedy trial analysis). Finally, we agree with the district court's finding that the final delay between September 8, 2014, and the April 22, 2015 jury trial weighs against Defendant due to the August 29, 2014 and January 20, 2015 continuances requested by defense counsel. Because four months and twenty days of delay are attributable to administrative delay by the State, one month and ten days of delay are attributable to neutral delay, but seven months and fourteen days of delay are attributable to Defendant, we conclude that the second *Barker* factor weighs against Defendant.

**D.    Assertion of the Right**

{24}    The third *Barker* factor requires that we consider whether the defendant asserted the right to a speedy trial. *Ochoa*, 2017-NMSC-031, ¶ 41. "The frequency and force" of the assertion of the right may be taken into account. *Id.* "On one hand, a single demand for a speedy trial is sufficient to assert the right. On the other hand, a defendant's assertion can be weakened by a defendant's acquiescence to the delay."

*Id.* ¶ 42. "[T]he consistency of a defendant's legal positions with respect to the delay" are also considered. *Id*.

{25} From the date of his arrest to trial, Defendant asserted his right to a speedy trial on five occasions. First, upon entering his appearance on July 9, 2014, Defendant's second trial counsel made Defendant's first demand for a speedy trial. On August 29, 2014, however, Defendant moved for a six-month continuance in order to continue his investigation and conduct witness interviews. In this motion, Defendant waived "all speedy trial claims for this period of continuance." Approximately a month later, on September 26, 2014, Defendant made his second demand for a speedy trial. This demand was closely followed by Defendant's third demand for a speedy trial made in the form of a motion to dismiss on speedy trial grounds on November 19, 2014. However, upon the district court's denial of Defendant's motion to dismiss on speedy trial grounds on January 20, 2015, Defendant immediately moved for another continuance of trial, stating that additional time was needed to set a hearing for remaining motions and to consider the State's plea offer. Defendant asserted his right to a speedy trial for the fourth time on February 5, 2015, at the fourth pretrial conference. Defendant's final assertion of his right to a speedy trial came in the form of his March 2, 2015 motion for reconsideration of the district court's order denying his November 19, 2014 motion to dismiss on speedy trial grounds.

{26}     Although Defendant's assertions of his right to a speedy trial were frequent, they lacked force and were further mitigated by Defendant's multiple motions for continuances, requests to the court for more time to conduct his investigation and interview witnesses, and requests to set motions hearings once the State had represented that it was ready for trial. *See State v. Flores*, 2015-NMCA-081, ¶ 31, 355 P.3d 81 (holding that "the force of a defendant's assertions [of his speedy trial right] is mitigated where he filed motions that were bound to slow down the proceedings, such as a motion asking for additional time, a motion to appoint new counsel, a motion to reset the trial, or other procedural maneuvers" (alteration, internal quotation marks, and citation omitted)). Accordingly, we conclude that the third *Barker* factor weighs against Defendant.

**E.     Prejudice**

{27}     The fourth *Barker* factor requires that we analyze the prejudice to the defendant as a result of the delay in bringing his case to trial. *Ochoa*, 2017-NMSC-031, ¶ 48. We assess prejudice "in the light of the interests of defendants which the speedy trial right was designed to protect. These interests are preventing oppressive pretrial incarceration, minimizing anxiety and concern of the accused, and limiting the possibility that the defense will be impaired." *Id.* (internal quotation marks and citation omitted).

{28} Defendant's sole claim of prejudice arising from his pretrial incarceration is that he "suffered from anxiety and concern" while the charges were pending and "lost the opportunity to earn good time on his probation violation." We reject this claim. Defendant received credit for six hundred and twenty-nine days pre-sentence confinement, which spanned from the date of his arrest on September 12, 2013, through June 2, 2015, as well as credit for his post-sentence confinement from June 2, 2015, until delivery to the New Mexico Department of Corrections. Additionally, although Defendant may have experienced some anxiety and concern as a result of his pretrial incarceration, he has made no showing that such anxiety or concern was undue beyond bare allegations. *See Garza*, 2009-NMSC-038, ¶ 35 (stating that because "some degree of oppression and anxiety is inherent for every defendant who is jailed while awaiting trial[,]" this factor weighs in the defendant's favor "only where the pretrial incarceration or the anxiety suffered is undue."(alterations, internal quotation marks, and citation omitted)); *see also Ochoa*, 2017-NMSC-031, ¶ 61 (stating that where the defendant offered no affidavits, testimony, or documentation with respect to his specific circumstances of anxiety, the Court declined to speculate as to the particularized anxiety or concern he may have suffered); *State v. Spearman*, 2012-NMSC-023, ¶ 39, 283 P.3d 272 (declining to hold that the defendant suffered undue anxiety based on the bare allegations of defense counsel). Accordingly, we

12

conclude that Defendant failed to establish prejudice cognizable under the fourth *Barker* factor.

**F.      Balancing the Factors**

{29}      Although Defendant established that his pretrial incarceration exceeded the guideline for intermediate complexity cases under the first *Barker* factor, for the reasons previously stated, we conclude that the remaining three factors (reasons for delay, assertion of the right, and prejudice) weigh against Defendant. Accordingly, we conclude that Defendant was not deprived of his constitutional right to a speedy trial.

**II.      The State Established That the Substances Found in the Deodorant Sticks Were Synthetic Cannabinoids as Defined Under New Mexico Law**

{30}      Defendant argues that when he was charged and tried for distribution of synthetic cannabinoids that the particular chemicals (5F-PB22 and PB-22) found in the deodorant sticks were not listed as controlled substances under the New Mexico Controlled Substances Act (CSA). *See* NMSA 1978, § 30-31-6(C)(19)(a)-(k) (2011). Accordingly, Defendant submits, "[t]he State failed to prove that the substance[s] inside the deodorant container w[ere] synthetic cannabinoids as prohibited" by New Mexico law.

{31}      Defendant's claim raises a mixed question of law and fact. Whether chemicals identified as "synthetic cannabinoids" that are not specifically enumerated under

13

Section 30-31-6(C)(19)(a)-(k) are excluded from control under the CSA is a question of statutory interpretation, which we review de novo. *See State v. Leong*, 2017-NMCA-070, ¶ 10, 404 P.3d 9 (stating issues of statutory interpretation are reviewed de novo). However, whether the State proved that the particular chemicals collected from the deodorant sticks as evidence in Defendant's case (5F-PB22 and PB-22) were "synthetic cannabinoids" as prohibited by law at the time Defendant was charged and tried in this case is a question of fact that we review for sufficient evidence. *See State v. Ross*, 2007-NMCA-126, ¶ 16, 142 N.M. 597, 168 P.3d 169 ("We review factual questions for sufficiency of the evidence[.]").

**{32}** We begin by determining whether chemicals identified as "synthetic cannabinoids" that are not specifically enumerated under §§ 30-31-6(C)(19)(a)-(k) are excluded from the CSA. "Our primary goal when interpreting statutory language is to give effect to the intent of the [L]egislature." *State v. Torres*, 2006-NMCA-106, ¶ 8, 140 N.M. 230, 141 P.3d 1284. "We do this by giving effect to the plain meaning of the words of [the] statute, unless this leads to an absurd or unreasonable result." *State v. Marshall*, 2004-NMCA-104, ¶ 7, 136 N.M. 240, 96 P.3d 801. "If the language of the statute is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." *State v. McWhorter*, 2005-NMCA-133, ¶ 5, 138 N.M. 580, 124 P.3d 215.

{33}    The CSA expressly designates "synthetic cannabinoids" as Schedule I controlled substances, "including" eleven specific synthetic cannabinoids that are then listed. Section 30-31-6(C)(19)(a)-(k). Because the language of Section 30-31-6 is clear and unambiguous, we hold that "synthetic cannabinoids" is not limited to those that are listed in subsections (a) through (k) of Section 30-31-6(C)(19). The word "including" following the term "synthetic cannabinoids" expresses a clear legislative intent that the listing of specific examples of "synthetic cannabinoids" that follows is not exclusive. *See United Rentals N.W., Inc. v. Yearout Mech., Inc.*, 2010-NMSC-030, ¶ 13, 148 N.M. 426, 237 P.3d 728 ("Our caselaw . . . recognizes that the use of the word 'includ[ing]' to connect a general clause to a list of enumerated examples demonstrates a legislative intent to provide an incomplete list[.]"); *see also State v. Strauch*, 2015-NMSC-009, ¶ 37, 345 P.3d 317 (quoting the New Mexico Legislative Council Service's Legislative Drafting Manual 31 (2000, amended 2008) for the proposition that in a New Mexico statute "the word 'includes' implies an incomplete listing"); *In re Estate of Corwin*, 1987-NMCA-100, ¶ 3, 106 N.M. 316, 742 P.2d 528 ("A term whose statutory definition declares what it 'includes' is more susceptible to extension of meaning by construction than where the definition declares what a term 'means.' It has been said the word 'includes' is usually a term of enlargement, and not of limitation. It, therefore, conveys the conclusion that there

15

are other items includable, though not specifically enumerated." (omission, internal quotation marks, and citation omitted)); *Wilson v. Rowan Drilling Co.*, 1950-NMSC-046, ¶ 90, 55 N.M. 81, 227 P.2d 365 ("A statute which uses the word 'including' (certain things) is not limited in meaning to that included." (citation omitted)). Accordingly, all chemicals that are "synthetic cannabinoids"—not only those enumerated under Section 31-30-6(C)(19)(a)-(k)—are Schedule I substances, the possession, distribution, or trafficking of which is a violation of law. *See* Section 30-31-20; NMSA 1978, § 30-31-21 (1987); NMSA 1978, § 30-31-22 (2011); NMSA 1978, § 30-31-23 (2011)

{34} We therefore proceed to determine whether the State presented sufficient evidence that the chemicals collected from the deodorant sticks (5F-PB22 and PB-22) were "synthetic cannabinoids" under Section 31-30-6(C)(19) when Defendant was charged and tried. *See State v. Ramirez*, 2018-NMSC-003, ¶ 6, 409 P.3d 902 (stating that appellate courts determine "whether substantial evidence, either direct or circumstantial, exists to support every element essential to a conviction beyond a reasonable doubt").

{35} Here, Deputy Sandy Loomis of the Curry County Sheriff's Office, testified that the substances found in the deodorant sticks that Ms. Ramirez attempted to deliver to Mr. Patrick at CCDC were collected as evidence and sent to the State's forensic

16

crime laboratory for analysis. Samuel Tony Titone, the State's expert in forensic chemistry, testified that he reviewed the analysis of the substances collected into evidence in Defendant's case. Based on his independent review of the crime lab's analysis, Mr. Titone concluded that the substances tested by the crime lab were methamphetamine and the chemicals 5F-PB22 and PB-22, which he testified are "synthetic cannabinoids." Mr. Titone testified that 5F-PB22 and PB-22 are categorized as synthetic cannabinoids because while completely synthetic, the chemicals mimic the effects of cannabis. Viewing the evidence in the light most favorable to the guilty verdict and indulging all reasonable inferences in favor of the verdict, we conclude that the State presented sufficient evidence to establish beyond a reasonable doubt that the chemicals collected from the deodorant sticks as evidence in Defendant's case (5F-PB22 and PB-22) were "synthetic cannabinoids" within the meaning of Section 31-30-6(C)(19).

**III.  The State Presented Sufficient Evidence to Support Defendant's Convictions**

{36}    Defendant argues that the State's case was founded on the theory that he directed Ms. Ramirez to drop off the hygiene items containing methamphetamine and synthetic cannibinoids at CCDC for Mr. Patrick. However, because the State did not call Ms. Ramirez to testify, Defendant contends there was a "missing link" in the State's case. Specifically, Defendant contends that the jury was asked to "surmise"

17

that the phone calls between him and Mr. Patrick concerning landscaping, storage, and hygiene connected Defendant to the substances found in the deodorant container, "despite no physical evidence whatsoever linking him to these items." Therefore, because "[i]t is entirely possible that Ms. Ramirez decided on her own" to take the substances found in the deodorant container into the jail, Defendant maintains that "[h]er testimony was critical to this case" and the absence of which led to a failure by the State to prove any of the counts beyond a reasonable doubt.

{37} Again, we "view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Carrillo*, 2017-NMSC-023, ¶ 42, 399 P.3d 367 (internal quotation marks and citation omitted). The central consideration in sufficiency of evidence review is whether substantial direct or circumstantial evidence exists to support a verdict beyond a reasonable doubt as to all essential elements of the crimes for which the defendant was convicted. *State v. Suazo*, 2017-NMSC-011, ¶ 32, 390 P.3d 674. In jury trials, "the jury instructions are the law of the case against which the sufficiency of the evidence supporting the jury's verdict is to be measured." *State v. Duttle*, 2017-NMCA-001, ¶ 18, 387 P.3d 885 (internal quotation marks and citation omitted).

**A.    The Charges Under Counts 1-3 of the Criminal Information and the Evidence Presented at Trial**

{38}    Under Count 1, the jury was instructed that in order to find Defendant guilty of trafficking methamphetamine, the State was required to prove beyond a reasonable doubt the following elements of the crime:

> [D]efendant transferred methamphetamine or caused the transfer of methamphetamine or attempted to transfer methamphetamine to another;
>
> [D]efendant knew that it was methamphetamine or believed it to be methamphetamine or believed it to be some drug or other substance the possession of which is regulated or prohibited by law;
>
> This happened in New Mexico on or about the 15th day of August, 2013.

{39}    Under Count 2, the jury was instructed that in order to find Defendant guilty of distribution of marijuana or synthetic cannabinoids, the State was required to prove beyond a reasonable doubt the following elements of the crime:

> [D]efendant transferred Marijuana or Synthetic Cannabinoids or caused the transfer of Marijuana or Synthetic Cannabinoids or attempted to transfer Marijuana or Synthetic Cannabinoids;
>
> [D]efendant knew that it was Marijuana or Synthetic Cannabinoids or believed it to be Marijuana or Synthetic Cannabinoids or believed it to be some drug or other substance the possession of which is regulated or prohibited by law;
>
> This happened in New Mexico on or about the 15th day of August, 2013.

19

{40} Finally, under Count 3, the jury was instructed that in order to find Defendant guilty of conspiracy to traffic controlled substances or distribute synthetic cannabinoids, the State was required to prove beyond a reasonable doubt each of the following elements of the crime:

> [D]efendant and another person by words or acts agreed together to commit Trafficking of Controlled Substances or Distribution of Marijuana[;]

> [D]efendant and another person intended to commit Trafficking of Controlled Substances or Distribution of Marijuana[;]

> This happened in New Mexico on or about the 15th day of August, 2013.

{41} At trial, Officer Stephanie Marshall of CCDC, testified that on August 15, 2013, she came in contact with Ms. Ramirez, who was visiting CCDC to drop off hygiene products to Mr. Patrick. These hygiene products included shampoo, toothpaste, a toothbrush, and deodorant. Officer Marshall also testified that it is common practice for items being dropped off for inmates to be inspected by CCDC officers, and that she inspected the hygiene products dropped off by Ms. Ramirez for Mr. Patrick. During this inspection, Officer Marshall testified that she found a green leafy substance and crystal-like substance wrapped in small baggies the size of marbles in the bottom of the deodorant. Officer Marshall turned over the substances to her supervisor.

{42}    Deputy Loomis testified that he was put in charge of the investigation of Defendant's case in part because he had access to the CCDC telephone call system and the ability to listen to telephone calls made to and from inmates in the facility. As part of his investigation, Deputy Loomis began listening to the recorded phone calls between Mr. Patrick and Defendant, and in particular the phone calls made between the two men shortly before and shortly after Ms. Ramirez's attempt to deliver the confiscated items to CCDC.

{43}    Through his search of the CCDC phone system, Deputy Loomis picked up on four phone calls of interest made between Mr. Patrick, a known drug trafficker, and Defendant. The first call was made on August 13, 2013, at 4:09 p.m. The conversation proceeded as follows:

> Defendant: Yesterday, my [inaudible] went to go get that. Didn't happen, bro. It wasn't ready.
>
> Mr. Patrick: Oh, alright.
>
>   . . . .
>
> Mr. Patrick: Okay, well, it probably won't be til tomorrow now because its like from 1 to 4 I think and 8 to 12.
>
>   . . . .
>
> Mr. Patrick: Just see if she could pay that storage tomorrow or something, you know?

Defendant: Yeah. That's what he had told them, man, when she called up there. And he said no, we didn't receive no paperwork on it. She said she told him that storage was due and that . . . she needed to go . . . pay it. . . . And then she called back in that afternoon and they said that it wasn't done yet. So.

. . . .

Defendant: Now that I got paid though, bro, I'll make sure I get you some hygiene, bro.

Mr. Patrick: Okay, that's cool. I appreciate it.

Defendant: I know how it is, homey, I was in there too. I know what's up, dog.

{44} Deputy Loomis summarized the first telephone call conversation as follows. Mr. Patrick was releasing some money from his account to someone so that his "storage" could be paid—more specifically, it was Mr. Patrick's "storage" and Defendant was going to make sure it got paid. Defendant also stated that he was going to go get Mr. Patrick some "hygeine." From this conversation, Deputy Loomis concluded that Defendant was telling Mr. Patrick that he would obtain some "hygiene" and send something into the jail in the hygiene.

{45} The second call was made on August 14, 2013 at 3:54 p.m.—the day before Ms. Ramirez dropped off the hygiene products at the jail. The call proceeded as follows:

Mr. Patrick: I just talked to the sergeant about that money to get released. She said that they can come pick it up now.

Defendant: Oh, they can pick it up now? Because my sister called earlier, like about at noon bro, and the lady up front said that they had received no request from nobody in weeks to pick up any money or nothing.

. . . .

Mr. Patrick: Tell her to come up here and if they give her any problems, ask for Sergeant Lujan.

. . . .

Defendant: Alright, I'll do that for you and I'll make sure your storage gets paid, bro. Promise.

{46} Deputy Loomis summarized the second telephone call conversation as Mr. Patrick conveying to Defendant that the money was ready to be released to whomever was coming to pick it up, to which Defendant responded that he would send his sister and make sure the "storage" was paid.

{47} The third call was made on August 16, 2013, at 9:07 a.m. The call proceeded as follows:

Mr. Patrick: Whatever happened?

Defendant: Your storage got paid, perro.

Mr. Patrick: Oh, it did?

Defendant: Mmm hmm.

Mr. Patrick: I don't know, right on. I appreciate it. I've got some property. Did you send me some property.

23

Defendant: Yeah.

Mr. Patrick: Yeah? Cause I got a toothbrush and all that, but, but I thought you was gonna get . . . [inaudible]

Defendant: Oh shit. My bad.

Mr. Patrick: Yeah, cause nada.

Defendant: Hmm?

Mr. Patrick: Nada. Didn't get any.

. . . .

Mr. Patrick: What all did you get me?

Defendant: I sent my cousin to the store, you know what I mean? And I told her to get lotion, toothpaste, toothbrush, body wash, shampoo, and deodorant and deodorant. So I told her.

Mr. Patrick: Yeah, well there wasn't, what I. There was just a toothbrush, toothpaste, lotion, body wash. That was it.

Defendant: Damn. That's not what's up, bro. I'll go get on her ass then.

. . . .

Mr. Patrick: Check it out.

{48}    Summarizing this conversation, Deputy Loomis testified that Mr. Patrick told Defendant that he did not get the deodorant that he was supposed to receive, to which Defendant responded that he would "get on" his cousin's "ass" about the problem.

24

Based on this conversation, Deputy Loomis concluded that "the deodorant was the key, having that then been intercepted with the drugs in it and then he [Defendant] had emphasized the deodorant, saying it twice that that was where it was sent in at—that he [Defendant] had to know how it was being sent in."

{49}   The fourth call was made on August 22, 2013. The call proceeded as follows.

Mr. Patrick: Did you ever ask your cousin?

Defendant:  No.

Mr. Patrick: No?

Defendant:  Nuh Uh.

Mr. Patrick: Shit.

Defendant:  When I get paid bro, I mean, I didn't have the time to get you no hygiene or nothing, dog. But you know what I'm saying? Like I said I get busy homey. . . . I'll get around to it, dog. . . . I sent that person to go get some hygiene for me, man. I guess they didn't do it, dog. My bad, dog, you know what I'm saying?

Mr. Patrick: Yeah.

Defendant:  Do you have enough to hold you up and stuff, dog?

Mr. Patrick: Yeah, til next week. You know what I'm saying?

Defendant:  Yeah, I haven't had time to smoke and do shit, dog.

             . . . .

Mr. Patrick: I don't need a toothbrush, you know what I'm saying? Just get all the other stuff if you can. You know what I'm saying?

Defendant: Okay, so except for the toothbrush, alright.

Mr. Patrick: Yeah, [inaudible] toothbrush, you know.

Defendant: Alright, I got you dog.

. . . .

Mr. Patrick: But yeah, but if you can try to do that for me this coming week. You know what I'm saying?

Defendant: I will. Hey, you need some of that money on your book dog, or what?

Mr. Patrick: I don't have anything right now, you know what I'm saying? I don't got no money.

. . . .

Defendant: Oh shit.

Mr. Patrick: I was kind of hoping to get some money. But that's cool, man. If you can, just get me some hygiene for next week, and I'll be alright.

Defendant: Alright, homey. I'll see what I can do, dog, okay?

Mr. Patrick: Okay, I appreciate it, dog.

{50}     Summarizing this final conversation between Defendant and Mr. Patrick, Deputy Loomis testified that Mr. Patrick asked Defendant again about hygiene products that he wanted. Deputy Loomis testified that Defendant responded that he

26

had not had time to get Mr. Patrick hygiene and that he had sent a person to do it, but guessed that the person had not followed through. Deputy Loomis also testified that in the over one-thousand jailhouse phone calls that he has reviewed in his career as an investigator that individuals arranging to bring contraband into the jail often use code words to describe their illegal activities. They frequently "use other words: delivery, stuff. Things that don't really fit into the conversation, but they don't raise a flag immediately."

{51} Based on all of the evidence available to him, Deputy Loomis testified that he concluded that in the four phone calls between Defendant and Mr. Patrick, the two were discussing that using Mr. Patrick's money from the jail, Defendant "was going to obtain contraband, illegal narcotics, and then send them into the jail through a third person in hygiene products."

**B.    Notwithstanding the Absence of Ms. Ramirez's Testimony, the Direct and Circumstantial Evidence Presented at Trial Was Sufficient to Support Defendant's Convictions**

{52} First, the State presented substantial evidence to establish that Ms. Ramirez dropped off hygiene products containing methamphetamine and synthetic cannabinoids to Mr. Patrick while he was incarcerated at CCDC. The evidence showed that on August 15, 2013, Ms. Ramirez visited CCDC to drop off hygiene products to Mr. Patrick. These hygiene products included shampoo, toothpaste, a

27

toothbrush, and deodorant. The evidence also showed that during an inspection of the hygiene products that Ms. Ramirez dropped off for Mr. Patrick, Officer Marshall found a green leafy substance and crystal-like substance wrapped in small baggies the size of marbles in the bottom of the deodorant sticks, which Officer Marshall turned over to her supervisor and which were later identified by the State's crime lab as methamphetamine and the synthetic cannabinoids: 5F-PB22 and PB-22.

{53} Additionally, viewing the evidence in the light most favorable to the guilty verdicts and indulging all reasonable inferences in favor of the verdicts, we conclude that the State presented substantial evidence to sustain Defendant's convictions beyond a reasonable doubt. The four phone calls between Defendant and Mr. Patrick showed that through the use of code words that the two were discussing, that with Mr. Patrick's money from the jail, Defendant "was going to obtain contraband" in the form of substances (methamphetamine and synthetic cannabinoids) that he knew to be illegal narcotics and then attempt to transfer them into the jail for Mr. Patrick. This was made evident circumstantially by Defendant and Mr. Patrick's telephone conversations discussing the release of money by Mr. Patrick to Defendant to pay his "storage" and purchase "hygiene" for Mr. Patrick, as well as by Defendant's emphasis on and Mr. Patrick's concern over the deodorant sticks that Defendant's "sister" or

"cousin" (Ms. Ramirez) attempted to deliver to Mr. Patrick on August 15, 2013, which contained methamphetamine and synthetic cannabinoids.

{54}   It was equally apparent circumstantially from the evidence that Defendant intended and agreed with another through words or acts to transfer methamphetamine and synthetic cannabinoids to Mr. Patrick in hygiene products. Through the telephone conversations between Defendant and Mr. Patrick, the State showed that an agreement was made between Defendant and Mr. Patrick and Defendant and Ms. Ramirez that Defendant would provide to his sister or cousin (Ms. Ramirez) methamphetamine and synthetic cannabinoids to transfer or attempt to transfer to Mr. Patrick in hygiene products. These agreements were evident by Defendant's surprise that the hygiene products, containing the methamphetamine and synthetic cannabinoids, which he had directed Ms. Ramirez to deliver to CCDC never actually made it to Mr. Patrick and by Defendant's statement that he would "get on" Ms. Ramirez's "ass" for failing to follow through with their agreement.

{55}   Based on all of the direct and circumstantial evidence, we conclude that a reasonable juror could have found Defendant guilty of all counts, notwithstanding the absence of Ms. Ramirez's testimony at trial.

**IV.   Defendant's Remaining Claims of Fundamental and Plain Error**

{56}   "To preserve an issue for review, it must appear that a ruling or decision by the

trial court was fairly invoked." Rule 12-321(A) NMRA. However, "[t]his rule does not preclude a party from raising or the appellate court, in its discretion, from considering . . . issues involving . . . plain error[ or] fundamental error[.]" Rule 12-321(B)(2)(b), (c). "The doctrine of fundamental error is applied only under extraordinary circumstances to prevent the miscarriage of justice." *State v. Maestas*, 2007-NMSC-001, ¶ 8, 140 N.M. 836, 149 P.3d 933. Fundamental error power is exercised only to correct injustices that shock the conscience of the court, a term that has been used in our appellate courts' precedents "both to describe cases with defendants who are indisputably innocent, and cases in which a mistake in the process makes a conviction fundamentally unfair notwithstanding the apparent guilt of the accused." *State v. Barber*, 2004-NMSC-019, ¶ 17, 135 N.M. 621, 92 P.3d 633. Similarly, "[p]lain error applies only where the substantial rights of the accused are affected" and the claimed error "created grave doubts concerning the validity of the verdict." *State v. Miera*, No. A-1-CA-34747, 2017 WL 5794129, ___-NMCA-___, ¶ 13, ___ P.3d ___ (Nov. 27, 2017).

**A.    The State Properly Charged Defendant with Trafficking Methamphetamine**

{57}    Claiming fundamental error, Defendant argues that even assuming that the evidence was sufficient to establish that Defendant directed Ms. Ramirez to deliver methamphetamine to Mr. Patrick while he was incarcerated in CCDC, this conduct

30

constituted being an accessory to bringing contraband into the jail, and should have been charged as such. *See* NMSA 1978, § 30-22-14(B), (C)(4) (2013) ("Bringing contraband into a jail consists of knowingly and voluntarily carrying contraband into the confines of a county or municipal jail." "[C]ontraband" includes "a controlled substance, as defined in the Controlled Substances Act[.]"); NMSA 1978, § 30-1-13 (1972) ("A person may be charged with and convicted of the crime as an accessory if he procures, counsels, aids or abets in its commission and although he did not directly commit the crime and although the principal who directly committed such crime has not been prosecuted or convicted[.]").

{58}    Assuming without deciding that the State could have charged Defendant as an accessory to bringing contraband into a jail, the facts conceded by Defendant—that Defendant directed Ms. Ramirez to deliver methamphetamine to Mr. Patrick while incarcerated in CCDC—were also sufficient to charge him with trafficking methamphetamine. *See* § 30-31-20(A)(2)(c) (stating that " 'traffic' means the . . . distribution, sale, barter or giving away of . . . methamphetamine, its salts, isomers and salts of isomers"); *State v. Ogden*, 1994-NMSC-029, ¶ 20, 118 N.M. 234, 880 P.2d 845 ("So long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his [or her]

31

discretion." (alteration, internal quotation marks, and citation omitted)). Accordingly, we conclude that the prosecutor's decision to charge Defendant under the trafficking statute was well within the limits of its prosecutorial discretion and did not give rise to fundamental error. *See State v. Santillanes*, 2001-NMSC-018, ¶ 21, 130 N.M. 464, 27 P.3d 456 (stating that "the [s]tate has broad discretion in charging" criminal offenses (internal quotation marks and citation omitted)).

**B.      Defendant's Sentence to a Second Degree Felony for Conspiracy Did Not Give Rise to Fundamental Error**

{59}      Defendant next claims that the jury's verdict for Count 3 was unclear, and that as a result, his sentence to a second-degree felony was excessive and amounted to fundamental error. Defendant contends that the lack of clarity in the jury's verdict stemmed from the conspiracy instruction, which provided that the jury could convict Defendant of the charge in Count 3 if it found that he either conspired to traffic controlled substances "or" conspired to distribute synthetic cannabinoids. And since the jury was not asked to differentiate between the two allegations on the guilty verdict form for Count 3, that stated "[w]e find [D]efendant GUILTY of Count 3 Trafficking controlled substances (distribution)(narcotic or meth) - conspiracy[,]" Defendant contends that it was uncertain whether he was convicted of conspiracy to traffic controlled substances or conspiracy to distribute synthetic cannabinoids. Defendant therefore concludes that without a specific finding on the conspiracy

charge, "he should have only been sentenced to the lesser penalty for conspiracy" to distribute synthetic cannabinoids.

{60} We agree with Defendant that there was a discrepancy in the drafting of the jury instruction and verdict forms for Count 3 in that the jury instruction, but not the verdict forms, distinguished between conspiracy to traffic controlled substances and conspiracy to distribute synthetic cannabinoids as alternative theories of guilt for Count 3. However, the district court's failure to give jury verdict forms for Count 3 that distinguished between conspiracy to traffic controlled substances and conspiracy to distribute synthetic cannabinoids did not invade Defendant's fundamental rights and did not give rise to fundamental error. *See State v. Herrera*, 1922-NMSC-035, ¶¶ 1-3, 28 N.M. 155, 207 P. 1085 (holding that the district court's failure to give verdict forms, under which a verdict of guilty as to one or more of them and not a guilty verdict as to the others might be rendered where the jury was instructed that such a verdict was possible, did not invade the defendant's fundamental rights and did not give rise to fundamental error).

{61} Additionally, as the State writes in its brief, "exactly the same evidence supports both conspiracy crimes, making it inconsistent for the jury to find [Defendant] guilty of" conspiracy to distribute synthetic cannbinoids, but not conspiracy to traffic controlled substance. Accordingly, "because [first degree felony]

trafficking was the highest crime conspired to be committed, [Defendant] was correctly sentenced to a second degree felony." *See* NMSA 1978, § 30-28-2(B)(1) (1979) (providing that "if the highest crime conspired to be committed is a capital or first degree felony, the person committing such conspiracy is guilty of a second degree felony").

**C.   The Prosecutor's Comments Concerning Ms. Ramirez's Reason for Not Testifying at Trial Did Not Constitute a Fundamental Error**

{62}   During closing argument, the prosecutor commented that:

> [Defendant is] trying to cast all the blame on Nicole, but what's her motive to do this? She hasn't one. I'm sure she doesn't want to testify. You heard from the officer, she was uncooperative. She's still family. She still has to face these people. She doesn't want to show up and testify. She doesn't want to cooperate with the police. But you know what, all the circumstantial evidence coming together, she doesn't have to. Because we have the conversations. We have Mr. Patrick's testimony where he says: I'm a drug user. I'm a drug dealer.

Defendant argues that fundamental error resulted from this comment because his statement that Ms. Ramirez "still has to face these people" insinuated "that she did not appear because she is afraid of Mr. Salazar." We disagree. *See State v. Sosa*, 2009-NMSC-056, ¶ 35, 147 N.M. 351, 223 P.3d 348 ("Fundamental error occurs when prosecutorial misconduct in closing statements compromises a defendant's right to a fair trial[.]"); *State v. Trujillo*, 2002-NMSC-005, ¶ 52, 131 N.M. 709, 42 P.3d 814 ("Prosecutorial misconduct rises to the level of fundamental error when it is so

34

egregious and had such a persuasive and prejudicial effect on the jury's verdict that the defendant was deprived of a fair trial." (internal quotation marks and citation omitted)); *State v. Fry*, 2006-NMSC-001, ¶ 50, 138 N.M. 700, 126 P.3d 516 (stating that in determining whether a defendant was deprived of a fair trial, the appellate courts "review the [challenged] comment in context with the closing argument as a whole" in order to "gain a full understanding of the comments and their potential effect on the jury." (internal quotation marks and citation omitted)).

{63}     Considering the prosecutor's comment that Ms. Ramirez "still has to face these people" in context with the closing argument as a whole, we conclude the prosecutor's statement did not give rise to fundamental error. The State simply argued that the evidence presented in the case was sufficient to convict Defendant notwithstanding the fact that Ms. Ramirez chose not to cooperate with the police or take the stand to testify against her cousin, Defendant. This comment was neither "egregious" nor so "persuasive and prejudicial . . . on the jury's verdict that [D]efendant was deprived of a fair trial." *See Trujillo*, 2002-NMSC-005, ¶ 52; *State v. McDowell*, No. S-1-SC-35245, 2018 WL 286126 , ___-NMSC-___, ¶¶ 18, 23-24, 34-35, ___ P.3d ___ (Jan. 4, 2018) (holding that the admission of prosecutor's unobjected to comments and eliciting of testimony from a witness concerning the

defendant's assertion of his fundamental right to remain silent was so prejudicial so as to give rise to fundamental error).

**D.     Admission of Officer Barela's Testimony Did Not Constitute Plain Error**

{64}     Deputy Loomis testified on cross-examination that he did not know if Defendant had cousins other than Ms. Ramirez, whether she had any other relatives in CCDC, whether she had ever brought items for other inmates, or whether Ms. Ramirez had ever been in jail or otherwise been involved in a gang.

{65}     During a bench conference and in response to Deputy Loomis' testimony, the State argued that Defendant had opened the door to the State calling Defendant's probation officer, Officer Barela, to testify by insinuating that Ms. Ramirez acted alone in bringing controlled substances into CCDC and that Defendant had no knowledge of Ms. Ramirez's plan. The district court ruled that it would permit Officer Barela to testify outside the presence of the jury to determine whether her testimony was admissible. After Officer Barela's testimony outside the presence of the jury, Defendant conceded that if he called Mr. Patrick to testify, then that would "certainly" open the door to Officer Barela's testimony. The district court agreed that Officer Barela should be permitted to testify, but instructed the State that Officer Barela could not testify as to the nature of the offense for which Defendant was on probation. Defendant later called Mr. Patrick to testify.

36

{66}     Defendant now contends that the district court erred in admitting Officer Barela's testimony. However, we conclude that by calling Mr. Patrick to testify, Defendant waived his objection to admission of Officer Barela's testimony. *See State v. Campos*, 1996-NMSC-043, ¶ 47, 122 N.M. 148, 921 P.2d 1266 ("Acquiescence in the admission of evidence, . . . constitutes waiver of the issue on appeal."). Accordingly, we decline to exercise our discretion under Rule 12-321(B)(2) to analyze Defendant's appellate challenge to the admission of Officer Barela's testimony "for the first time on appeal." *See Campos*, 1996-NMSC-043, ¶ 47 ("The doctrine of fundamental error cannot be invoked to remedy the defendant's own invited mistakes.").

**CONCLUSION**

{67}     For the foregoing reasons, we affirm the district court's judgment and sentence.

{68}     **IT IS SO ORDERED.**

_____
**MICHAEL E. VIGIL, Judge**

**WE CONCUR:**

_____
**JULIE J. VARGAS, Judge**

_____
**TIMOTHY L. GARCIA, Judge Pro Tempore**